IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | : | CIVIL ACTION |
| ex rel. JESSE POLANSKY, M.D., M.P.H. | : | NO. 12-4239 |
| | : | |
| v. | : | |
| | : | **FILED** |
| EXECUTIVE HEALTH RESOURCES, | : | MAY 1 0 2016 |
| INC., et al. | : | |
| | | MICHAEL E. KUNZ, Clerk |
| O'NEILL, J. | | By———Dep. Clerk    May 10, 2016 |

## MEMORANDUM

Relator Jesse Polansky brings this qui tam action against defendants Executive Health

Resources, Inc. (EHR), UnitedHealth Group, Inc. (UHG), United HealthCare Services, Inc.

(UHCS), Optum, Inc., OptumInsight, Inc., Yale-New Haven Hospital, Inc. (YNHH) and

Community Hospital of the Monterey Peninsula (CHOMP). Relator brings his claims on behalf

of the United States, twenty-eight states and the District of Columbia pursuant to the False

Claims Act (FCA), 31 U.S.C. §§ 3729, et. seq., and analogous state laws.

Before me are defendants' three motions to dismiss relator's second amended complaint[1]

(Dkt. No. 12) pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b): one by EHR (Dkt.

No. 52, Ex. A), one by UHG, UHCS, Optum and OptumInsight (Dkt. No. 51) and one by

defendant hospitals YNHH and CHOMP (Dkt. No. 90). Also before me are relator's opposition

briefs (Dkt. No. 62, attached briefs) and the parties' supplemental briefs (Dkt. Nos. 70, 78, 84

and 89). For the reasons that follow, I will grant in part and deny in part EHR's motion, grant

YNHH and CHOMP's motion and grant UHG, UHCS, Optum and OptumInsight's motion.

---

[1]    Because no prior filings have addressed relator's previous complaints, unless
otherwise specified any reference to relator's complaint below refers to his second amended
complaint.

## BACKGROUND

Relator alleges a nationwide and nearly decade-long multi-million dollar scheme by defendant EHR to defraud Medicare and Medicaid by causing client hospitals, including defendants YNHH and CHOMP, to knowingly and falsely bill patient admissions as inpatient when they should have properly been billed as outpatient services.  See Dkt. No. 12 at ¶¶ 2, 5. Defendants UHG, UHCS, Optum and OptumInsight are EHR's parent companies; relator seeks to hold them liable both directly and vicariously for EHR's actions.  Id. at ¶¶ 4, 244.

### I.      The Parties

Relator Jesse Polansky, M.D., M.P.H. is a physician with experience in Medicare, Medicaid, and commercial health insurance.  Id. at ¶ 10.  Relator held leadership positions within the Centers for Medicare and Medicaid Services (CMS) from 2003-2011.  Id.  Relator began "advising senior management at defendant EHR regarding regulatory affairs, business development, new product development, and professional services" on or about December 14, 2011 until he left EHR on or about February 13, 2012.  Id. at ¶ 11.  Relator observed details about EHR's business practices while working there and bases his allegations on what he contends he discovered during that time.  Id. at ¶ 12.

Relator alleges FCA violations against seven defendants.  Defendant EHR is a physician advisor company which "provides payment certification services to hospitals and health care systems for Medicare and Medicaid patients and private commercial health plan patients, pursuant to which cases are certified by EHR for billing purposes as either inpatient or outpatient."  Id. at ¶ 13.  EHR provides these certifications "in the context of patients arriving at a hospital and entering the emergency department or as direct admissions as well as patients undergoing outpatient surgery."  Id.  EHR also appeals cases for its clients when Medicare or

Medicaid denies coverage for patients who were billed as inpatient. Id. at ¶¶ 13, 168-179.

EHR is a subsidiary of defendant OptumInsight, a "health information, technology, services and consulting company providing software and information products, advisory consulting services, and business process outsourcing to participants in the health care industry." Id. at ¶ 18. OptumInsight acquired EHR on August 4, 2010. Id. at ¶ 4. Defendant OptumInsight is a subsidiary of defendant Optum. Id. at ¶¶ 16, 18. Defendant Optum is "one of the main business platforms of UHG" and is a subsidiary of defendant UHCS. Id. at 16. Defendant UHCS is a subsidiary of defendant UHG. Id. at ¶ 15. Finally, defendant UHG is the parent company to all of these subsidiaries and "supplies a broad range of health care services, such as health care benefits to individuals and employers, retail pharmacy network claims processing and assistance to hospitals, to improve clinical performance, financial performance and regulatory compliance." Id. at ¶ 14.

There are two hospital defendants in this case: YNHH and CHOMP. Defendant YNHH is a privately owned non-profit hospital in New Haven, Connecticut. Id. at ¶ 22. YNHH is the largest hospital in Connecticut. Id. at ¶ 202. YNHH "contracted with EHR to perform second level review of Medicare cases" from "no later than 2008 until at least February 2012." Id. at ¶ 204. Defendant CHOMP is a privately owned non-profit hospital in Monterey, California. Id. at ¶ 21. In 2007, CHOMP "contracted with EHR to perform second level reviews of all Medicare and Medicaid cases" that fail its internal review criteria for inpatient status. Id. at ¶¶ 220, 225.

Relator's allegations begin in January 2006 against EHR, 2007 against CHOMP, 2008 against YNHH, and August 2010 against UHG and its subsidiaries. Id. at ¶ 27.

## II.   Regulatory Framework

Medicare is a federal health insurance program for eligible elderly people or people with

3

disabilities. 42 U.S.C. §§ 1395-1395lll (2015).  There are four major parts of Medicare, of which

parts A and B are relevant here.  See 42 U.S.C. §§ 1395c-1395w-6.  Medicare Part A covers

certain hospital inpatient services, home health services and hospice care.  42 U.S.C. §§ 1395c,

1395d(a).  Medicare Part A reimburses hospitals for covered inpatient services based on a

patient's diagnosis at discharge, which may or may not reflect the hospital's actual costs.  See 42

U.S.C. § 1395ww(d)(4), 42 C.F.R. § 412.2(a).  Medicare Part B pays for additional health

services, including hospital outpatient services.  See 42 U.S.C. § 1395k(a)(2)(H).  Medicare Part

B reimburses hospitals for outpatient services based on a patient's service or procedure, which

may or may not reflect the hospital's actual costs. See 42 U.S.C. § 1395l(t)(1), 42 C.F.R. §

419.2(a).

Medicaid is a health insurance program for low-income people that is jointly funded by

the federal government and state governments.  42 U.S.C. §§ 1396-1396w-5.  Both federal and

state statutes and regulations apply to state-administered Medicaid programs.  See 42 U.S.C. §

1396a.  CMS, a federal agency under the Department of Health and Human Services, administers

the Medicare and Medicaid programs.

III.   Alleged Scheme

Relator alleges that defendants perpetrated a scheme to systematically bill false inpatient

claims through hospital admissions to Medicaid and Medicare that should have properly been

billed as outpatient claims in order to receive higher reimbursements.  Dkt. No. 12 at ¶ 2.  All

claims for hospital services are billed either as inpatient or outpatient.[2]  See id. at ¶¶ 47, 57, 63-

65.  Medicare and Medicaid reimburse hospitals for medical services at different rates based on

---

[2]      Outpatient services may include observation services, which doctors use to
determine the need for further treatment or a possible inpatient admission; once the observation
period ends, a patient is either admitted to the hospital as an inpatient or discharged from the
hospital because his or her condition has improved.  Dkt. No. 12 at ¶¶ 57-58.

4

patient classification as inpatient or outpatient. Id. at ¶ 63. Hospital billing classifications do not affect the quality of care or the services that patients receive. Id. at ¶ 128. However, billing classifications do significantly affect the amount of payment a hospital receives for the services it provides. Id. at ¶¶ 66-67. For this reason, relator alleges that "there is a strong financial incentive for hospitals to formally admit patients as inpatients even though they can be safely and effectively as well as more economically treated as outpatients." Id. at ¶ 66.

Hospitals must have in place an internal review protocol when classifying patients as inpatients or outpatients before they seek reimbursement from Medicare or Medicaid. See 42 C.F.R. § 482.30. First, a patient's attending physician "generally makes the initial judgment" about a patient's admission status. Id. at ¶ 71. Hospitals then complete a first level internal review of attending physicians' determinations as required by regulation. Id. at ¶ 72. Internal committees within hospitals typically utilize "industry-standard" internal review criteria to evaluate a patient's initial inpatient or outpatient status. Id. Such committees "can unilaterally change [a] patient['s] status from outpatient observation to inpatient." Id. at ¶ 73. When patients do not qualify for inpatient status at the first level of review, hospitals often rely on a "physician advisor" to conduct a second level review. Id. at ¶ 74. Physician advisors may be accessible at the hospital or may work off-site. Id. at ¶ 75.

Relator alleges that many hospitals seek second level reviews of outpatient admissions because Medicare and Medicaid "pay hospitals more for services provided to patients who are inpatient status than for the same services provided to patients who are outpatient status." Id. at ¶ 81. Relator alleges that the federal government has implemented numerous review programs and "taken significant steps toward preventing hospitals from billing Medicare for inpatient stays that should have been treated as outpatient observation cases." Id. at ¶ 77.

5

A.    EHR

Relator alleges that defendant EHR is at the heart of a nationwide scheme to defraud

Medicare and Medicaid by exploiting the different reimbursement rates between hospital

inpatient and outpatient services when it performs second level reviews for hospitals. Id. at ¶ 2.

Relator alleges that EHR knowingly misconstrues CMS regulations when it reviews hospital

admission determinations, fraudulently certifying "thousands upon thousands of cases" for

hospitals to submit to Medicare and Medicaid as inpatient claims rather than outpatient as

appropriate. Id.

Defendant EHR is a second level review physician advisor firm. Id. at ¶ 75. EHR has

been providing hospitals with second level patient admission status reviews since at least 2003.

Id. at ¶ 82. Relator contends that "EHR, by its own calculation, has performed over ten million

reviews." Id. at ¶ 121; see id. at ¶ 82. Relator alleges that hospitals often hire EHR to "perform

a second level review of all cases where the attending physician's initial status determination

fails the [internal review criteria at a hospital's first level of review] for inpatient status." Id.

Relator alleges that EHR's marketing platform has been designed to "induce over 2,000

U.S. hospitals to retain EHR to perform inpatient medical necessity reviews." Id. at ¶ 84.

Relator first claims that "EHR goes to great lengths to cause hospitals to believe that [their

internal review criteria] are extremely inaccurate, and thereby caus[ing] a significant volume of

inpatient cases to be inappropriately billed as outpatient." Id. at ¶ 87. However, relator alleges

that the internal review criteria used by hospitals in their first level reviews "have long been

widely used and respected within the health care industry [and] routinely result in patients being

admitted and billed as an inpatient." Id.

Relator claims that "EHR asserts that it is difficult to get physicians to correctly assign

6

patient status determinations" so that it is best for hospitals to leave it to EHR's expertise. Id. at ¶ 91. Relator alleges that EHR "instill[s] fear into hospitals" about their potential liabilities if they do not use EHR to help them navigate Medicare and Medicaid's complex regulatory frameworks.[3] Id. at ¶ 95-96. Relator alleges that today, as a result of EHR's marketing tactics, "[o]ver 50% of U.S. hospitals are [EHR] clients." Id. at ¶ 100. Relator maintains that hospitals pay for EHR's services "because the increase in revenue attained from submitting cases as inpatient under Medicare Part A, rather than as outpatient under Medicare Part B, typically more than offsets the cost of the service." Id. at ¶ 103.

EHR allegedly relies on a "secret" set of criteria when performing second level reviews for its clients rather than using the publicly available criteria that hospitals frequently use internally. Id. at ¶ 89. Relator claims that EHR does not reveal its case review criteria to its client hospitals or to the public. Id. at ¶ 117. EHR allegedly "does not follow CMS requirements" or "simply ignores" CMS guidance when evaluating cases to "boost the revenues of its clients hospitals" and its own profits.[4] Id. at ¶ 119. Relator claims that EHR is able to bypass CMS regulations at a large scale because "the payment process is by and large an honor system" where "[c]laims for payment are typically accepted at face value" by reviewing agencies, "[t]he likelihood that any given claim is going to be audited is very remote" and

---

[3]     EHR allegedly advises hospitals that if they rely on its inpatient review certifications, they can "qualify for [a] liability waiver" in the Social Security Act where hospitals can "transfer accountability and audit risk for inpatient hospital decisions to EHR" if the hospitals "could not have reasonably known that the services provided would not be covered by Medicare." Dkt. No. 12 at ¶ 96.

[4]     EHR allegedly told a family of hospitals in 2008 that it would focus on conducting second level reviews of "procedures that tend to have shorter stays" if it were retained to review cases to prevent the hospitals from ▮▮▮▮▮▮▮▮▮▮▮▮ Id. at ¶ 166. Relator maintains that EHR's proposed focus on short stays indicates that "EHR was focused not on increasing [the hospitals'] compliance rate[s] but rather solely and illegally on revenue enhancement." Id. at ¶ 167.

hospitals do not submit EHR's certifications with their claims. Id. at ¶ 120. Because Medicare and Medicaid pay claims and must then try to recover payments that it discovers to be fraudulent "through retrospective reviews and recoupment activities," relator alleges that "this process only recovers a fraction of improper payments." Id. at ¶ 266.

Once EHR completes certifications for its clients, relator alleges that "for virtually all cases it reviews, EHR's inpatient certification is determinative of the billing status that the hospital submits" for payment.[5] Id. at ¶ 115. Relator alleges that in a compliance initiative by the Department of Health and Human Services targeting "high risk" hospitals, his "preliminary analysis identified that EHR hospital clients had significantly higher rates of improper payments than other high-risk hospitals." Id. at ¶ 197.

Relator also alleges that EHR pursues appeals for inpatient claims on behalf of hospitals after hospitals delegate the authority to submit their claims for payment directly to EHR. Id. at ¶ 168. Relator maintains that since CMS has become "more engaged in defending payment denials," hospitals success rates at appealing claim denials at the ALJ level "have plummeted." Id. at ¶ 174. Relator alleges that EHR nonetheless encourages hospitals to "be aggressive in allowing it to appeal denied inpatient claims up through the ALJ level," contributing to current delays of "upwards of four years for a case to reach an ALJ." Id. at ¶ 172.

Relator contends that EHR's criteria for classifying a case as inpatient or outpatient fail CMS regulations for several reasons. Id. at ¶¶ 122-165. Relator maintains that EHR does not

---

[5]     For example, relator discusses a South Carolina hospital that in January 2012 allegedly indicated that "EHR has the authority to 'override' the [internal review criteria] and assign inpatient status" and a New Jersey hospital that in March 2012 allegedly indicated that "EHR's opinion regarding inpatient status carries as much weight as the treating physician's opinion." Id. at ¶ 195-96. Relator alleges that "EHR's inpatient certifications were clearly a substantial factor in the false inpatient claims" submitted by a Mississippi hospital because "every time EHR changed a patient's status from outpatient to inpatient, the hospital simply adopted EHR's determination." Id. at ¶ 200.

consider a patient's prospective length of stay as required by CMS regulations. Id. at ¶ 122.

Relator alleges that EHR's criteria "categorically disregard the payment rules which direct that

observation care is appropriate when treating patients whose short term clinical trajectory is

uncertain." Id. at ¶ 123. Relator also maintains that EHR generally does not consider whether

diagnostic studies need to be performed in order to help physicians determine whether a patient

should be admitted as an inpatient. Id. at ¶ 124. Relator claims that "EHR misinforms and

misleads its physician advisors about the pertinent CMS statutory and interpretive guidance."[6]

Id. at ¶ 125.

EHR allegedly determines whether to certify cases as inpatient based on whether cases

are ███████████ rather than considering all of the factors addressed in CMS guidance.[7] Id. at

¶ 131. Relator alleges that if a ████████████████████████████████████████████████

████████████████████████████████████████████ Id. at ¶ 111. Rather than

being an individualized judgment, EHR allegedly completes certifications "rapidly and . . . by a

formulaic and mechanical process." Id. at ¶ 112.

Relator alleges that EHR has had internal doubts about its criteria. Id. at ¶ 180. Relator

claims that EHR has never "subjected [its] criteria to any meaningful internal or external

validation," and when relator attempted to suggest updates to the criteria in line with CMS

---

[6]      Relator cites EHR's promotional materials to allege that in summer 2008 EHR's materials initially referenced the "need for diagnostic studies" and the "availability of such studies" — factors outlined in CMS guidance — as part of its review process, but ████████████████ Id. at ¶ 126.

[7]      Relator alleges that EHR's case review criteria is often "a checklist of risk factors" which are "so over-inclusive that inpatient treatment will be deemed reasonable and necessary for the vast majority of Medicare or Medicaid beneficiaries" who present with certain conditions or who have a certain medical history. Id. at ¶ 135. Relator maintains that EHR's review system does not "accurately predict extended lengths of stay." Id. Relator provides examples by alleging how EHR evaluates risk factors for kyphoplasty and chest pain without considering length of stay or diagnostic testing. Id. at ¶¶ 132-34, 139-141.

9

regulations to EHR leadership, he did not receive a response. Id. at ¶ 138. Soon after he arrived

at EHR in December 2011, relator alleges that he encouraged EHR's CCO to "engage CMS's

leadership in an open discussion on the regulatory requirements for inpatient versus outpatient

services." Id. at ¶ 184. Relator contends that the CCO told him that ███████████████████

████████████████████████████████████████████████████████████ Id.

Relator contends that in a January 2012 email, EHR's Associate Vice President of Strategic

Accounts found it ██████████████████████████████ after viewing a diagram

from a government-approved agency highlighting that there should be a "24 to 48 hour

outpatient window to assess response to therapy and complete essential diagnostic testing." Id.

at ¶ 180.

　　　Relator also alleges that on February 1, 2012, EHR's CCO asked him to prepare ████████

████████████████████████████████████████████████████████

████ Id. at ¶ 181. Relator alleges that the CCO said that relator's analysis was needed in order

to ███████████████████████████████████████████████████████

████████████████████████████████████████████████

████ Id. After relator provided feedback on EHR's approach on February 9, 2012, he

alleges that he "never received any direct feedback" and that "a few hours later he was instructed

that he could not attend a monthly regulatory affairs meeting attended by senior management."

Id. at ¶ 182. Relator was also allegedly "forbidden to discuss his concerns with members of the

EHR regulatory affairs team or his former colleagues at the Medicare program." Id. After

raising his concerns to EHR's management and receiving no response, relator contends that on

February 9, 2012 he forwarded his memo to EHR's President and Chief Executive Officer to

request a meeting and was denied. Id. at ¶ 183. Relator left EHR sometime in February 2012. Id. at ¶ 212.

### B.   YNHH

Defendant YNHH allegedly contracted with EHR from 2008 until at least February 2012 to review Medicare cases that failed the hospital's internal review for inpatient admissions. Id. at ¶ 204. Relator alleges that YNHH submitted and was reimbursed for inpatient claims using EHR's certifications after "EHR applied its fraudulent case review criteria to YNHH's cases." Id. at ¶ 206. Relator contends that on December 16, 2011, YNHH was audited by a government review contractor, which retroactively denied all twenty of the twenty cases it reviewed "because they did not qualify for inpatient status." Id. at ¶ 207. Relator alleges that YNHH "expressed concern to EHR about whether EHR's reviews were compliant with Medicare and Medicaid rules and regulations." Id. at ¶ 210. Relator alleges that in January 2012, EHR's CCO allegedly communicated that "there was a significant risk that YNHH would terminate its contract with EHR." Id. Relator alleges that EHR's CCO told someone at YNHH that "even though the government may reject inpatient claims that EHR certifies through probe and audit functions, [the government] will pay a substantially greater percentage without ever reviewing them, resulting in YNHH receiving millions more in reimbursements than it would without EHR." Id. at ¶ 211. Relator maintains that at the time he left EHR in February 2012, YNHH was still contracting with EHR for its second level review physician advisor services. Id. at ¶ 212.

Relator alleges that YNHH is liable for the submission of false claims because it was put "on notice" by the December 2011 audit and because it had "a duty to familiarize itself with the legal requirements for inpatient status." Id. at ¶ 213. Relator maintains that "it is reasonable to infer" that because the government audit of twenty cases found all of them improper for inpatient

11

status, YNHH's other inpatient claims "were routinely false and YNHH knew or recklessly disregarded that fact." Id.

### C.    CHOMP

Defendant CHOMP allegedly contracted with EHR from 2007 onward. See id. at ¶¶ 221-25. Relator alleges that once EHR began conducting second level reviews for CHOMP, all Medicare admissions that failed the first internal round of screening for inpatient admissions would be sent for EHR review and CHOMP allowed EHR to make the "final decision regarding admissions status." Id. at ¶ 226. Relator also maintains that in its first year reviewing cases for CHOMP, EHR certified 81.5% of cases it reviewed for CHOMP as inpatient. Id. at ¶ 227. When CHOMP referred cases to EHR that had been previously billed as outpatient claims, EHR allegedly certified "95% of these cases as inpatient." Id. at ¶ 228.

Relator contends that CHOMP should have questioned the legality of EHR's approach because "EHR certified as inpatient such a high percentage of cases" that were initially certified as outpatient by the hospital. Id. at ¶ 229. Relator also contends that CHOMP should have been "skeptical of the legitimacy of EHR's review criteria and the accuracy of its admission status decisions" because EHR did not share its case review criteria with CHOMP. Id. at ¶ 230. Like YNHH, relator alleges that CHOMP submitted false claims relying on EHR's certifications although it had "a duty to familiarize itself with the legal requirements for inpatient status." Id. at ¶ 233.

### D.    UHG and subsidiaries

Many of relator's allegations against UHG and its subsidiaries are grouped together under actions taken by "the UHG Defendants." See id. at ¶ 239. For example, relator contends that "the UHG Defendants acquired EHR" in August 2010 through OptumInsight. Id. Relator

alleges that because EHR offers a single, highly specialized second level review service, a "highly-sophisticated acquirer like [any of the] the UHG Defendants[] would undoubtedly engage in a due diligence review of EHR's service." Id. at ¶ 245. Relator alleges that while completing due diligence, UHG and its subsidiaries "learned, or deliberately ignored, that EHR's review process repeatedly results in the submission of false claims for inpatient billing by hospitals." Id. at ¶ 247. In the alternative, relator contends that if UHG and its subsidiaries did not "review and test" EHR's model, they "deliberately ignored or recklessly disregarded that EHR is engaging in a systemic scheme that defrauds the government." Id.

Relator alleges that UHG and its subsidiaries have substantially benefitted financially from their acquisition of EHR. Id. at ¶ 259. Additionally, relator contends that he put UHG and its subsidiaries on notice of EHR's alleged fraudulent scheme when he discussed his concerns about EHR with representatives from Optum and UHG on June 11, 2012. Id. at ¶ 270. Relator claims that he offered to "assist in correcting EHR's business practices" or answer any questions but never heard back from any UHG or subsidiary representatives. Id. at ¶ 274. Relator then filed his initial complaint in this case on July 26, 2012. Relator's specific allegations of wrongdoing for each defendant are listed below.

           1.     **UHG**

Relator alleges that after OptumInsight acquired EHR, "EHR's employees became employees of UHG." Id. at ¶ 253. Relator also alleges that UHG "collaterally benefits" from EHR's scheme because commercial alternatives to Medicare Part A — such as Medicaid Part C plans offered by UHCS — "become more attractive." Id. at ¶¶ 261, 266.

### 2.   UHCS

Relator asserts that as part of the due diligence conducted by UHG and its subsidiaries, a "sophisticated team of experts from UHCS conducted an extensive review of EHR's operations, including a detailed evaluation of . . . its case review criteria." Id. at ¶ 246. Relator alleges that "several EHR employees were transferred to new positions within UHCS" after OptumInsight acquired EHR, including a physician executive and a physician advisor. Id. at ¶¶ 253-54. Relator alleges that both of these employees "were trained to be experts in applying the EHR case review criteria" and that one employee "was moved to UHCS to serve as a high level resource" on EHR's "case review criteria, business platform, and business practices." Id. at ¶ 254.

UHCS and UHG have also allegedly used and "publicly endorsed" one form of internal review criteria used by many hospitals in their first level review of patient admissions decisions. Id. at ¶ 263. Relator maintains that as a result, UHCS is either "fully aware of the material differences" between EHR's criteria and the criteria it has endorsed, or has "willfully turned a blind eye" to the differences. Id. at ¶ 264.

### 3.   Optum

Relator contends that a current Group Executive Vice President at Optum and former Chief Executive Officer at OptumInsight executed corporate documents in August 2010 that "represented he was EHR's President." Id. at ¶ 250. Relator maintains that Optum and OptumInsight promote EHR's services on their websites. Id. at ¶¶ 255-57. Relator alleges that because Optum and OptumInsight market EHR, "both entities are either aware of the fraudulent scheme alleged . . . or are acting in reckless disregard of the scheme." Id. at ¶ 258.

### 4.   OptumInsight

Relator alleges that after OptumInsight acquired EHR, OptumInsight's managers "were promptly installed at top levels of EHR management," noting one manager who moved to EHR. Id. at ¶ 248. The Chief Medical Officer for Provider Consulting at OptumInsight is allegedly a faculty member at an EHR-managed educational program. Id. at ¶ 249. OptumInsight's current President of Life Sciences represented that "he was EHR's Executive Vice President, Chief Operating Officer, and Assistant Treasurer" in EHR's amended articles of incorporation in August 2010. Id. at ¶ 251. OptumInsight's General Counsel was allegedly listed as EHR's Secretary on EHR's corporate profile website as of May 14, 2013. Id. at ¶ 252.

### E.   Counts

Relator's 182-page complaint ends with sixty-six counts against defendants under both state and federal law. The first four counts are federal FCA claims against EHR, UHG and its subsidiaries, YNHH and CHOMP. Id. at ¶¶ 275-301. Count one claims that EHR and UHG and its subsidiaries violated the FCA under 31 U.S.C. § 3729(a)(1)(A) (post-FERA)/31 U.S.C. § 3729(a)(1) (pre-FERA) by providing false certifications of inpatient admissions to client hospitals, causing the submission of false claims, and directly submitting false claims on behalf of client hospitals. Id. at ¶¶ 275-281. Count two claims that CHOMP and YNHH violated the same FCA provisions by knowingly submitting false inpatient claims for reimbursement in contravention of applicable regulations. Id. at ¶¶ 282-288. Counts three and four claim that EHR, UHG and its subsidiaries, YNHH and CHOMP violated 31 U.S.C. § 3729(a)(1)(B) (on or after June 7, 2008)/31 U.S.C. § 3729(a)(2) (before June 7, 2008) by knowingly making or using a false record or statement that is material to a false claim or to get a false claim paid by the government. Id. at ¶¶ 289-301.

Relator's counts six and eight claim that CHOMP violated the California FCA based on false Medicaid claims on the same grounds as the federal FCA. Id. at ¶¶ 307-311, 317-321. Counts twelve and fourteen claim that YNHH violated the Connecticut FCA based on false Medicaid claims on the same grounds as the federal FCA. Id. at ¶¶ 337-341, 347-351. Relator's remaining counts claim that EHR and UHG and its subsidiaries violated the state FCAs of twenty-eight states and the District of Columbia FCA on the same grounds as the federal FCA. Id. at ¶¶ 302-06, 312-16, 322-36, 342-46, 352-611.

### F.   Procedural History

Relator commenced this suit on July 26, 2012. The action was filed under seal as required by 31 U.S.C. § 3730(b)(2). Relator filed an amended complaint on June 12, 2013 and a second amended complaint on March 24, 2014 while the United States considered intervention. The United States declined to intervene in this case on June 27, 2014, after which relator served all defendants.[8]

I have granted, or will grant in an order accompanying this memorandum, all parties' motions to file their motions and briefs under seal.[9] Defendants filed three motions to dismiss relator's complaint under Federal Rule of Civil Procedure 12(b)(6) and 9(b) and filed supporting briefs and reply briefs. Relator filed a reply brief and sur-reply brief in opposition to all defendants' motions.

---

[8]     Relator's motion to voluntarily dismiss all claims against additional defendant OptumInsight Holdings, LLC was granted on November 18, 2014.

[9]     I will address two outstanding motions to seal briefs at Dkt. No. 62 from this round of briefing and Dkt. No. 49 from a previous round of briefing in an order accompanying this memorandum.

## STANDARD OF REVIEW

### I.    Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action

for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief

"requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual

allegations must be enough to raise a right to relief above the speculative level . . . on the

assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id.

(citations omitted). This "simply calls for enough fact[s] to raise a reasonable expectation that

discovery will reveal evidence of" the necessary element. Id. at 556. The Court of Appeals has

made clear that after Ashcroft v. Iqbal, 556 U.S. 662 (2009), "conclusory or 'bare-bones'

allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal,

all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially

plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009), quoting Iqbal, 556

U.S. at 678. The Court also set forth a two part-analysis for reviewing motions to dismiss in

light of Twombly and Iqbal:

> First, the factual and legal elements of a claim should be separated.
> The District Court must accept all of the complaint's well-pleaded
> facts as true, but may disregard any legal conclusions. Second, a
> District Court must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a "plausible
> claim for relief."

Id. at 210-11, quoting Iqbal, 556 U.S. at 679. The Court explained, "a complaint must do more

17

than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement

with its facts." Id., citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to

relief.'" Iqbal, 556 U.S. at 679, quoting Fed. R. Civ. P. 8(a)(2).

II.     Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake. Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." To satisfy the

"particularity" requirement of 9(b) at the pleadings stage, an FCA claimant may identify

"particular details of a scheme to submit false claims paired with reliable indicia that lead to a

strong inference that claims were actually submitted." Foglia v. Renal Ventures Mgmt., LLC,

754 F.3d 153, 155-56 (3d Cir. 2014) (internal citations omitted). An FCA claimant is not

required to show "the exact content of the false claims in question" to survive a motion to

dismiss., as "requiring this sort of detail at the pleading stage would be 'one small step shy of

requiring production of actual documentation with the complaint, a level of proof not demanded

to win at trial and significantly more than any federal pleading rule contemplates.'" Foglia, 754

F.3d at 156, quoting U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009).

DISCUSSION

Dr. Polansky, a private individual, has brought this suit as a qui tam relator on behalf of

the government to enforce several provisions of the FCA. 31 U.S.C. § 3730(b). On May 20,

2009, Congress enacted the Fraud Enforcement Recovery Act (FERA), Pub. L. No. 111-21, 123

Stat. 1617 (2009), which amended the FCA. Relator alleges violations of post-FERA section

18

3729(a)(1)(A) and pre-FERA section 3729(a)(1) for knowingly presenting or causing the

submission of false claims to the government. Relator also alleges violations of post-FERA

section 3729(a)(1)(B) and pre-FERA section 3729(a)(2) for making or using a false record or

statement that is material to a false claim or to get a false claim paid by the government.[10]

    To state a claim under section 3729(a)(1) both pre- and post-FERA, a party must allege

---

[10]    The FERA amended the relevant FCA sections by re-designating 31 U.S.C. §
3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) as 31 U.S.C. §
3729(a)(1)(B). U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 303 (3d Cir.
2011). The pre-FERA version of the FCA allowed a cause of action against:

> [a]ny person who —
> (1) knowingly presents, or causes to be presented, to an officer or
> employee of the United States Government or a member of the
> Armed Forces of the United States a false or fraudulent claim for
> payment or approval; [or]
> (2) knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Government.

31 U.S.C. § 3729(a)(1)-(2) (2008). With the FERA amendment, the FCA now imposes liability
on:

> any person who —
> (A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1)(A)-(B).
    In this case, pre-FERA FCA sections 3729(a)(1)-(2) apply to alleged FCA violations
before May 20, 2009 for defendants EHR, YNHH and CHOMP. Post-FERA section
3729(a)(1)(A) applies alleged FCA violations for all defendants after May 20, 2009. The FERA
provided a retroactivity provision for the new section 3729(a)(1)(B), stating that it "shall take
effect as if enacted on June 7, 2008, and apply to all claims under [the FCA] that are pending on
or after that date." Pub. L. No. 111-21, 123 Stat 1617 at 1625. Thus, section 3729(a)(2) applies
to all claims before June 7, 2008 for defendants EHR, YNHH and CHOMP while amended FCA
section 37(a)(1)(B) applies to all claims pending on or after June 7, 2008 for all defendants.
    Several parties cite these different standards but have not briefed if or how the changes
impact the viability of relator's claims pre- and post-FERA. See Dkt. No. 52, Ex. A at 10-11;
Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 12-13; Dkt. No. 90 at 7-8.

that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."[11] U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004). Pre-FERA, a party had to plead these same elements to pursue a claim under FCA section 3729(a)(2), in addition to pleading "that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." Id. Post-FERA, section 3729(a)(1)(B) requires a plaintiff to plead that a defendant knowingly made, used or caused to be made or used "a false record or statement material to a false or fraudulent claim."[12]

Defendants have filed three motions to dismiss in the following groups: 1) defendant EHR (Dkt. No. 52, Ex. A); 2) defendants YNHH and CHOMP (Dkt. No. 54, brief at Dkt. No. 90); and 3) defendants UHG, UHCS, Optum and OptumInsight (Dkt. No. 51). Defendants all file their motions to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim upon which relief can be granted and failure to plead fraud with particularity. Relator filed two briefs in opposition (Dkt. No. 62, attached briefs), arguing that he has pled sufficient facts to state a claim against each defendant and that the fraudulent scheme he alleges is sufficient to survive the heightened pleading standards of Rule 9(b). Defendant EHR filed a reply brief (Dkt. No. 78), YNHH and CHOMP filed a reply brief (Dkt. No. 89) and UHG and its subsidiaries filed a reply brief (Dkt. No. 70). Finally, relator filed a sur-reply brief responding to

---

[11]     The FCA both before and after the FERA defines the terms "knowing" and "knowingly" as when "a person, with respect to information — (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," without requiring "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(A).

[12]     The amended FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

all defendants (Dkt. No. 84). I will address each of the three motions below.

I.     **Defendant EHR**

EHR has moved to dismiss all of relator's counts against it for failure to plead causation with particularity, failure to state a claim in alleging falsity, failure to adequately plead state law claims under both Rule 9(b) and 12(b)(6), failure to state a claim for EHR's appeals of client claim denials and failure to state a claim in alleging knowledge. Relator maintains that he has provided full and detailed allegations against EHR to survive its motion under both Rule 9(b) and Rule 12(b)(6). For the following reasons, I will grant in part and deny in part EHR's motion.

A.     9(b)

EHR argues that relator has failed to plead causation with particularity and that relator's state law claims are not pled with particularity. Relator maintains that he has pled causation with particularity and that his state law claims allege a nationwide scheme with sufficient particularity.

1.     **Causation**

EHR contends that relator has failed to plead fraud with particularity by failing to adequately plead the element of causation.[13]  The Court of Appeals has explained that to satisfy Rule 9(b)'s particularity requirement at the pleadings stage, an FCA claimant may identify "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155-56 (3d Cir. 2014) (internal citations omitted). An FCA claimant need not

---

[13]     Although EHR's argument regarding causation in the brief it attaches to its motion does not discuss or cite to Rule 9(b)'s standard in the FCA context, EHR's motion does mention seeking dismissal based on a failure "to plead the alleged fraudulent conduct with particularity." See Dkt. No. 52, Ex. A. In EHR's reply brief, it clarifies that it relies on Rule 9(b) in seeking dismissal of relator's claim for failure to plead causation. Dkt. No. 78 at 13.

plead "the exact content of the false claims in question" to survive a motion to dismiss based on

Rule 9(b). Id. at 156. Relator argues that he has alleged many particular details of EHR's

scheme to cause medical providers to submit claims that fraudulently fail to comply with

applicable regulations.

EHR argues that relator "disregards the central role the attending physician plays in

deciding whether to admit a patient and bill for inpatient services and, thereby, fails to plead that

EHR caused the submission of false claims." Dkt. No. 52, Ex. A at 20. EHR argues that

because certain regulations state that a patient's physician should make the ultimate

determination about a patient's admissions status, EHR's reviews cannot cause the submission of

false claims. Id. at 21-22. EHR argues that relator has failed to allege the required "nexus

between EHR's recommendation and the attending physician's decision to order an inpatient

admission" because relator "fails to plead sufficient facts showing how EHR fraudulently causes

attending physicians to order an inpatient admission." Id. at 21, 23. EHR also contends that

relator "does not plausibly allege why attending physicians across the nation (who are not

employed by or compensated by EHR or hospitals) would be motivated to accept EHR's

allegedly fraudulent second-guessing of their clinical judgment." Id. at 24.

Relator argues that he has alleged that EHR's inpatient certifications were "routinely the

determinative factor in causing false claims for inpatient hospital care to be submitted." Dkt. No.

62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 53. Relator argues that contrary to EHR's

assumed review sequence of "physician order, first level review using [internal review] criteria,

and finally the second level review by EHR," he has alleged how "the process is not nearly so

rigid, that treating physicians' orders often follow the hospitals' first level and second level

review and moreover, that EHR regularly interacts with the treating physician to have the

22

original order changed to make it consistent with EHR's certification." Id. at 55.

Indeed, relator has made detailed allegations regarding EHR's critical role in its clients' admission status review processes. Relator contends that "hospitals are required to undertake their own assessment — separate and apart from whatever the individual treating physicians may or may not order — of whether the services they provide should be" billed as inpatient or outpatient. Id. at 56. As part of their mandated review process, relator alleges that "[m]ost of EHR's hospital clients retain it to perform a second level review of all cases that fail [internal review criteria] for inpatient status." Dkt. No. 12 at ¶ 106. In the review process, relator contends that hospitals "essentially delegate utilization review of cases that fail inpatient criteria to EHR rather than perform the reviews in-house." Id. Relator alleges that EHR promotes itself as the national expert about hospital admissions determinations and "goes to great lengths to cause hospitals to believe that [their internal review criteria] are extremely inaccurate, and thereby cause a significant volume of inpatient cases to be inappropriately billed as outpatient." Id. at ¶¶ 85-87.

EHR allegedly "asserts that it is difficult to get physicians to correctly assign patient status determinations" to validate EHR's own determinations as based in the proper regulatory framework and advises doctors that they "don't need to understand the nuances and the rules." Id. at ¶ 91-92. Relator summarizes the relationship between EHR and its hospital clients by alleging that:

> [i]n almost every instance, when the hospital client submits for payment the Medicare and Medicaid claims that EHR has reviewed and certified for inpatient status, it adopts that inpatient billing status determination notwithstanding the fact that the hospital's first level review has typically determined that outpatient status with observation services was appropriate and sometimes, the attending physician did as well. Indeed, as EHR explains to

23

clients and prospective clients, when EHR reaches an inpatient decision that differs from the decision of the attending physician, EHR and the hospital case managers are generally successful in obtaining a new order from the physician that is consistent with EHR's decision. Thus, for virtually all cases it reviews, EHR's inpatient certification is <u>determinative</u> of the billing status that the hospital submits to the Government Payers. EHR provides tracking reports to hospitals to ensure that hospital status orders match the certifications.

<u>Id.</u> at ¶ 115 (emphasis in original). Relator argues that these allegations show that regardless of whether the initial physician ordered inpatient or outpatient status or made no order until after EHR's review, "hospitals do not rely upon the treating physicians to decide inpatient vs. outpatient billing status." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 57, <u>citing</u> Dkt. No. 12 at ¶ 106. Relator also provides numerous allegations of specific cases in which EHR's involvement allegedly led its clients to bill for false claims. <u>See, e.g.</u>, Dkt. No. 12 at ¶¶ 164-65, 191-92, 195-96, 198.

EHR cites <u>In re Schering Plough Corp. Intron/Temodar Consumer Class Action</u>, 678 F.3d 235 (3d Cir. 2012), to support its argument that relator fails to adequately plead causation. In <u>Schering Plough</u>, the Court of Appeals affirmed a finding below that the plaintiffs in a racketeering case lacked standing because the plaintiffs failed to establish a causal link between their off-label drug purchases and the defendants' alleged unlawful misrepresentations. 678 F.3d at 248, 253. However, in the FCA context, the Court of Appeals has found that even when one party may make "its own decision to file a false certification, this is not inconsistent with a conclusion that [another party] caused that filing" when the latter party's scheme was a "substantial factor in bringing about" the false filings. <u>U.S. ex rel. Schmidt v. Zimmer, Inc.</u>, 386 F.3d 235, 244 (3d Cir. 2004).

Relator argues that he has alleged that EHR was "not just a substantial factor but

routinely the determinative factor in causing false claims for inpatient hospital care to be submitted." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 53. Relator relies on a number of cases in the FCA context to support his contention. See id. at 53 n.23, citing, e.g., Schmidt, 386 F.3d at 244 (finding that the relator sufficiently pled causation where the defendant allegedly marketed and implemented a kickback scheme targeting health care providers who then submitted claims without disclosing the kickbacks); U.S. ex rel. Bates v. Dentsply Int'l, Inc., No. 12-7199, 2014 WL 4384503, at *8 (E.D. Pa. Sept. 4, 2014) (same). I agree that relator's detailed and specific allegations of EHR's role within the hospital review process and its influence on its clients' final billing decisions are sufficient to plead causation.[14]

### 2.    State law claims

EHR also seeks to dismiss relator's claims against it under state laws analogous to the FCA. Relator argues that he has sufficiently alleged claims under the laws of twenty-seven states[15] and the District of Columbia to survive EHR's motion to dismiss.

EHR argues that relator has failed to "plead with specificity conduct in most of the states and commonwealths on whose behalf he purports to sue." Dkt. No. 52, Ex. A at 25. EHR contends that relator has only alleged specific conduct in California, Connecticut, New York and Massachusetts but has failed to make any particularized allegations against EHR relating to state Medicaid programs in any of the other states or the District of Columbia. Id. EHR relies on one

---

[14]    Relator also makes an argument that certain Medicare Appeals Council decisions involving EHR support its argument that it has adequately alleged causation. See Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 64-66. However, I cannot and need not look beyond the allegations contained in relator's complaint to find that relator has sufficiently pled causation.

[15]    Relator voluntarily dismisses without prejudice all of his claims under the New Mexico Medicaid False Claims Act — Counts XLVII and XLVIII. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 67 n.31. Relator maintains that he has sufficiently alleged his remaining state law claims.

case to support its argument, Dentsply, which found that the plaintiff's "conclusory" allegations about the defendant's scheme failed to allege "location-specific" facts in certain states. 2014 WL 4384503, at *10-11.

Relator argues that he has alleged a nationwide scheme and should not be required to plead specific facts in every state in order to pursue his claims. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 66-67. Relator notes that he has alleged dozens of specific hospitals around the country to be EHR clients and that EHR provides review services for over half of the country's hospitals. Id. Relator relies on U.S. ex rel. Brown v. Celgene Corp., No. 10-3165, 2014 WL 3605896, at *10 (C.D. Cal. July 10, 2014), where the Court allowed a relator's state FCA claims to proceed because the relator's complaint made "allegations about [the defendant's] nationwide, systemic practices, not [state]-specific allegations." The Court in Celgene noted that there was "no reason to conclude that [the defendant's] alleged misconduct was limited to" one state. Id.

Relator's alleged nationwide scheme is factually closer to the scheme in Celgene than in Dentsply. While the alleged scheme in Celgene was a uniform nationwide marketing and kickback scheme, 2014 WL 3605896, at *1, the kickback scheme in Dentsply involved specific "rewards and incentives" that varied by the medical provider the defendant targeted, from free trips abroad, equipment or meals to free tickets, baseball games or promotion of a specific doctor's course, 2014 WL 4384503, at *2-5. See also U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012) ("Certainly, Plaintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery, as such information rests solely within Defendants' control."). At this stage, relator

has alleged the nationwide scope of EHR's scheme with sufficient particularity.[16]

**B.    12(b)(6)**

EHR argues that relator has failed to state a claim under Rule 12(b)(6) by failing to adequately plead knowledge and falsity. EHR also argues that relator's claims based on EHR's appeals of client hospital claims and relator's state law claims are insufficiently pled. Relator maintains that he has sufficiently pled all of the elements required by the FCA for all of his claims against EHR.

**1.    Falsity**

EHR's first argument under Rule 12(b)(6) is that relator has not pled falsity. Dkt. No. 52, Ex. A at 11. EHR asserts that "[e]xpressions of opinion, scientific judgments or statements as to conclusions which reasonable minds may differ cannot be false." Id., quoting U.S. ex rel. Hill v. Univ. of Med. & Dentistry of New Jersey, 448 F. App'x 314, 316 (3d Cir. 2011). EHR characterizes its second level case review process just the kind of "complex medical judgment" that CMS regulations outline. Dkt. No. 52, Ex. A at 13. EHR argues that its approach to case review involves a "reasonable interpretation of Medicare guidelines" so that the claims it certifies cannot be false. Id. at 16.

Relators may pursue FCA claims under either a theory of factual falsity or legal falsity. U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011). A claim is factually false when "the claimant misrepresents what goods or services that it provided to the

---

[16]    EHR argues in a footnote that several state statutes were not in effect during part of the time period when relator alleges EHR was causing the submission of false claims and that they cannot apply retroactively. Dkt. No. 52, Ex. A at 26 n.7. Relator argues that "this is insufficient to carry EHR's burden on a motion to dismiss." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 67 n.30. EHR has not provided further argument, statutory language or citations to authority about the potential retroactivity of the statutes it cites. I decline to dismiss these claims at this time without further briefing by the parties.

Government." See id.; In re Genesis Health Ventures, Inc., 112 F. App'x 140, 143 (3d Cir. 2004).

In contrast, "[a] legally false FCA claim is based on a 'false certification' theory of liability." Wilkins, 659 F.3d at 305. A claim is legally false when "the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment."[17] See id.

Legally false certifications can be express or implied. Id. An express false certification is when a claimant falsely certifies that "it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." Id. Implied false certification is a broader theory of liability, where a claimant makes a claim "without disclosing that it violated regulations that affected its eligibility for payment." Id. at 305-06. A relator relying on an implied false certification theory "must show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." Id. at 307.

### a.    Factual Falsity[18]

Relator argues that he has sufficiently pled that "EHR caused hospitals, including YNHH and CHOMP, to submit bills for inpatient services that were factually false." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 69. Relator contends that the bills hospitals submitted

---

[17]    Therefore, whether a claimant's certification of legal compliance with a government program is a condition of payment "is not directly relevant for a 'factually false' claim argument." Foglia, 754 F.3d at 157 n.7.

[18]    Relator addresses factual falsity in the parts of his briefs that respond to both EHR and YNHH and CHOMP's motions to dismiss. See Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 69-70. Since his arguments supporting a theory of factual falsity addressing YNHH and CHOMP apply with equal force to his claims against EHR, I address them here.

after review by EHR were factually false because "claims for reimbursement for inpatient services are false on their face or literally false — the bills indicate that the beneficiaries who receive the services are inpatient status when in fact they do not meet Medicare and Medicaid's inpatient requirements and therefore should instead be classified as outpatient hospital status." Dkt. No. 84 at 15.

Relator argues that "by mischaracterizing their services as inpatient in order to obtain higher reimbursements, [hospitals] overcharged the government for their services" through EHR's certifications, comparing his allegations to those in Foglia. Id. However, in Foglia, where the relator's claim was "best understood as a factually false claim," the relator alleged a scheme in which the defendant overbilled the government for vials of medication intended to be used only a single time but actually harvested the leftover medication in the vials to use for other patients. 754 F.3d 153, 157 (3d Cir. 2014) (internal quotation marks omitted). The relator in Foglia therefore alleged a factually false scheme in which the defendant misrepresented the goods or services that it provided to the government by using the leftover medication. Id. at 157-58.

Here, in contrast, relator has repeatedly alleged that patients receive the same services whether they are billed as inpatients or outpatients. Relator alleges that "[w]hether a hospital classifies a Medicare or Medicaid patient as an outpatient receiving observation services or as an inpatient is a choice that pertains solely to billing, not to the scope or intensity of care which the patient receives." Dkt. No. 12 at ¶ 127. Relator contends that:

> [f]or each patient, the same tests and treatments are administered, the same nursing care is given, and the same bed and board are provided in the outpatient setting as would be administered in the inpatient setting. The difference lies in how the Government Payer is billed, and the hospital is paid.

Id. at ¶ 128. In either an inpatient or outpatient setting, relator maintains that a "patient can expect to have the same tests performed to help assess and reassess his/her condition that would be performed if he/she were admitted as an inpatient." Id. at ¶ 125. Relator alleges that "[t]he scope and intensity of care patients receive from hospital [outpatient] observation services will generally be indistinguishable from the care he or she would receive if classified as a hospital inpatient." Id. at ¶ 128.

At no point does relator allege that EHR caused hospitals, including YNHH and CHOMP, to seek reimbursement for goods or services which they failed to provide, or where they misrepresented the goods or services they provided to patients. For example, relator does not allege that EHR caused hospitals to "submit[] a claim for cardiac bypass surgery when only an EKG was performed" or "submit[] claims for services rendered to fictitious patients." U.S. ex rel. Colucci v. Beth Israel Med. Ctr., 785 F. Supp. 2d 303, 314 (S.D.N.Y. 2011), aff'd sub nom. Colucci v. Beth Israel Med. Ctr., 531 F. App'x 118 (2d Cir. 2013).

Instead, relator's theory of falsity is grounded in the billing rate that EHR certified was appropriate for hospitals regarding services that relator does not contest were provided. See Colucci, 785 F. Supp. 2d at 314 (holding that the relator could not proceed on a theory of factual falsity for an alleged overbilling scheme when the relator's "quarrel appear[ed] to be with the rates used by [the defendant] in its claimed reimbursements, not the factual basis for those claims") (emphasis in original). Relator's allegations of improper billing are grounded in violations of regulatory requirements, not in any actual false representations of the services the hospitals provided to their patients for each bill they submitted, since relator has alleged that

30

there is no difference in the level, quality or scope of care.[19] See U.S. ex rel. Wall v. Vista Hospice Care, Inc., 778 F. Supp. 2d 709, 718-19 (N.D. Tex. 2011) (finding that the relator could not proceed on a factual falsity theory where the defendant "allegedly submitted inaccurate claims for hospice services because the patients were ineligible for hospice, based on the hospice eligibility statute," not because the bills incorrectly described what hospice services were provided or sought reimbursement for hospice services that were never provided). Therefore, I find that relator has not stated an FCA claim under a factually false theory.

### b. Legal Falsity

Relator primarily relies on a theory of legal falsity to allege liability, arguing that EHR's certifications led hospitals to bill for services in violation of standards in regulations and government manuals. See Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 35, 70-71. EHR questions relator's interpretation of CMS' guidance, arguing that relator has failed to plead

---

[19]  Relator also cites one case outside of this Circuit to support his position. In U.S. ex rel. Guardiola v. Renown Health, No. 3:12 -00295, 2014 WL 4162201, at *1, 4 (D. Nev. Aug. 20, 2014), the Court found that a relator survived a motion to dismiss under a factual falsity theory where the relator alleged that a hospital improperly billed outpatient claims as inpatient claims due to a faulty computer system, an internal assignment process that improperly always assigned certain procedures as inpatient and a lack of a post-procedure internal review process for patient status. The relator in that case only proceeded under a factual falsity theory and did not address legal falsity in her filings. Guardiola, 2014 WL 4162201, at *4 n.3.

The Guardiola Court stated that "the issue is whether [the defendant] submitted inpatient claims for patients who were not properly admitted and/or characterized by [the defendant] as inpatient based on the services provided." Id. at *9. Without lengthy analysis, the Court found "that her allegations speak for themselves" in determining that her "claims are appropriately characterized as factually false claims." Guardiola, 2014 WL 4162201, at *4 n.3. I find more persuasive a distinction between factual and legal falsity that is grounded in the difference between a literal false representation of a service provided to a patient and a representation that is false because it fails to comply with statutory or regulatory mandates in the process of billing for that fully provided service.

Additionally, relator cites U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 385-86 (1st Cir. 2011) in support of his factual falsity theory, but in that case, the Court of Appeals for the First Circuit rejected the distinction between factually and legally false claims used to analyze falsity in this and other Circuits.

objective falsity because its physician advisors make "complex medical judgments about which reasonable minds may differ and which . . . [are] based on a reasonable interpretation of the applicable regulations and guidelines." Dkt. No. 52, Ex. A at 13. Defendants YNHH and CHOMP also address the falsity of relator's claims, arguing that relator fails to state a claim because none of the regulations and manuals relator relies on constitute conditions of payment. Dkt. No. 90 at 41-43.

Relator alleges that EHR knowingly caused hospitals including YNHH and CHOMP to falsely certify that they were in compliance "with a statute or regulation the compliance with which is a condition for Government payment." See Wilkins, 659 F.3d at 305. Courts have distinguished conditions of government payment for a claim from conditions of participation in a government program. Id. at 309. Conditions of participation "are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program, while [c]onditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." Id. at 309, citing U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1220 (10th Cir. 2008) (internal quotation marks omitted). Relator argues that he can rely on several conditions of payment with supporting statutes, regulations and manuals with which he claims defendants failed to comply. See Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 71.

Relator primarily argues in support of one theory of implied false certification. He contends that CMS' standards for inpatient status located in its Medicare Benefit Policy Manual constitute a condition of payment that defendants violated when they submitted claims that should have been billed as outpatient status claims. Id. at 35, 71. The Medicare Benefit Policy Manual, CMS Pub. 100-02, ch. 1 § 10 — an informal guidance manual by CMS — provides the

32

following guidance on inpatient determinations:

> An inpatient is a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services.[20]  Generally, a patient is considered an inpatient if formally admitted as inpatient with the expectation that he or she will remain at least overnight and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight.
>
> The physician or other practitioner responsible for a patient's care at the hospital is also responsible for deciding whether the patient should be admitted as an inpatient.  Physicians should use a 24-hour period as a benchmark, i.e., they should order admission for patients who are expected to need hospital care for 24 hours or more, and treat other patients on an outpatient basis.  However, the decision to admit a patient is a complex medical judgment which can be made only after the physician has considered a number of factors, including the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting.  Factors to be considered when making the decision to admit include such things as:
>
> •    The severity of the signs and symptoms exhibited by the patient;
> •    The medical predictability of something adverse happening to the patient;
> •    The need for diagnostic studies that appropriately are outpatient services (i.e., their performance does not ordinarily require the patient to remain at the hospital for 24 hours or more) to assist in assessing whether the patient should be admitted; and
> •    The availability of diagnostic procedures at the time when and at the location where the patient presents . . .

Claims processors and reviewing bodies rely on this guidance and, since October 1, 2013,

---

[20]    CMS defines an outpatient as "a person who has not been admitted by the hospital as an inpatient but is registered on the hospital records as an outpatient and receives services (rather than supplies alone) from the hospital . . ."  Medicare Benefit Policy Manual, CMS Pub. 100-02, ch. 1, § 10, ch. 6 § 20.2.

accompanying regulations to review inpatient claims.[21]

CHOMP and YNHH argue that the Medicare Benefit Policy Manual "does not expressly state that it creates conditions of payment" and thus that it cannot establish conditions of payment sufficient to support FCA liability. Dkt. No. 90 at 44. First, CHOMP and YNHH cite a case in which a relator failed to plead an off-label drug use scheme with sufficient specificity when relying on certain provisions of the Medicare Benefit Policy Manual. U.S. ex rel. Simpson v. Bayer Corp., No. 05-3895, 2014 WL 1418293, at *10 (D.N.J. Apr. 11, 2014). As relator points out, this case is distinguishable both because it refers to different provisions of the Medicare Benefit Policy Manual and because here, the relator does identify particular provisions with which defendants allegedly failed to comply. See Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 72.

EHR, CHOMP and YNHH also rely on a case involving a different policy manual which "by its terms . . . does not purport to address the physician's decision to submit a claim for reimbursement" and did not dictate the particular requirement with which the plaintiff claimed the defendant was falsely certifying compliance. U.S. ex rel. Swafford v. Borgess Med. Ctr., 98 F. Supp. 2d 822, 828 (W.D. Mich. 2000), aff'd, 24 F. App'x 491 (6th Cir. 2001). Here too I agree with relator that this case is factually distinguishable because it discussed a different policy manual which was not routinely provided to physicians and in Swafford the relator failed to "adduce[] any facts to support an inference that the physicians knew or believed these

---

[21]      The Secretary of HHS noted that during a rulemaking process after this case began that it was necessary to "clarify" the prior guidance in this CMS manual. Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals . . ., 78 Fed. Reg. 27486, 27648 (May 10, 2013). The rulemaking process resulted in new regulations, including 42 C.F.R. § 412.3(d)(1), which implemented the rule that "an inpatient admission is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights"; the relevant CMS manual provisions remain unchanged.

34

regulations to be applicable to their submissions." See Swafford, 98 F. Supp. 2d 822 at 828; Dkt.

No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 72.  In contrast, the provisions in the

Medicare Benefit Policy Manual on which relator relies are intended for physicians and

healthcare providers to use and are directly applicable to the inpatient/outpatient reimbursement

distinction.[22]

Defendants argue that relator's theory of legally false certification "depends on his

personal interpretation of Section 10 of the Policy Manual" and should therefore be disregarded

because length of stay is not the only factor physicians may consider in determining a patient's

status, which involves a "complex medical judgment."[23]  Dkt. No. 89 at 15; see Dkt. No. 52, Ex.

A at 13.  Relator counters with a series of Medicare Appeals Council decisions that discuss the

importance of the requirements for inpatient admissions in the Medicare Benefit Policy Manual,

but I need not depend on these decisions to find that the manual's inpatient requirements

function as a condition of payment.[24]

---

[22]      EHR also relies on Luckey v. Baxter Healthcare Corp., 2 F. Supp. 2d 1034, 1048
(N.D. Ill. 1998), aff'd, 183 F.3d 730 (7th Cir. 1999), a case in which the Court found that
differing scientific opinions on a certain practice was insufficient to establish FCA liability.  Dkt.
No. 78 at 6.  However, in Luckey, the Court noted that there was "no indication that the contracts
or regulation required the type of testing advocated by [the plaintiff], or subjected [the
defendant] to penalties for failing to disclose its refusal to utilize this testing."  2 F. Supp. 2d at
1048.  In this case, relator relies on specific CMS guidance to establish falsity rather than his
own personal idea of what constitutes an appropriate inpatient admission.

[23]      To support its argument, EHR contends that two other CMS manuals dispute
relator's interpretation of the Medicare Benefit Policy Manual because they do not discuss the
24-hour benchmark.  Dkt. No. 78 at 8.  However, like the manual at issue in Swafford, the
manuals relied on by EHR do not appear to be meant for physicians to use in making admissions
decisions and instead are geared toward medical review contractors and quality improvement
organizations.

[24]      EHR argues that Medicare Appeals Council decisions are not precedential and
that they should not be afforded deference for factually similar situations.  Dkt. No. 78 at 9.
Relator argues that although CMS has directed that each case should be reviewed "based on its
own facts" and that reviewers should "not defer to prior decisions involving similar patient
cases," an agency's interpretation of its own regulations should be entitled to deference.  Dkt.

Relator does not allege that EHR fails to consider length of stay as the only relevant factor in determining patient status in its certifications for hospitals. Relator alleges that EHR's review process fails to consider several criteria in CMS guidance entirely, for thousands of cases, and instead systematically relies on a limited set of criteria that never considers length of stay or the need for and results of diagnostic testing, among other factors. See Dkt. No. 12 at ¶ 122 (alleging that "EHR exclusively focuses its review on patient risk at the time of presentation to the hospital for services" rather than ever considering length of stay or the other factors in the Medicare Benefit Policy Manual); see also id. at ¶¶ 123-65. As a result, relator's approach is not at odds with the "complex medical judgment" that the CMS guidance leaves room for when considering inpatient status in individual cases.

Relator argues that the "consequence if there were no objective standards would be a wildly arbitrary system of reimbursement in which hospitals could assign inpatient status for billing purposes whenever they wanted to, for any reason." Dkt. No. 84 at 5. Using EHR's interpretation, the government would have few grounds on which to deny a claim payment. Relator has alleged that EHR "by its own calculation[] has performed over 10 million reviews." Dkt. No. 12 at ¶ 121. Under EHR's approach, because every inpatient admission involves a "complex medical judgment," providers could categorically decide never to consider length of stay or other factors in the Medicare Benefit Policy Manual and could use their own set of factors to make every determination. This interpretation would allow medical providers to submit claims for services under an inpatient status without complying with a standard and would make meaningful review difficult if not impossible. Under the facts relator has alleged, it is plausible that "if the government knew" that certain factors discussed in CMS guidance for

No. 84 at 9. I note only that decisions of the Medicare Appeals Council relied on by both relator and EHR utilize the Medicare Benefit Policy Manual's standards to review inpatient admissions.

36

determining inpatient status are rarely or never considered when examining EHR's certifications in the aggregate, it "might cause [the government] to actually refuse payment." See Wilkins, 659 F.3d at 309.[25]

### 2.   Knowledge

EHR also argues that relator has failed to sufficiently plead knowledge because it claims that relator's "difference of opinion" on the applicable regulations fails to plead the level of knowledge required by the FCA. Relator argues that he has sufficiently alleged that EHR knowingly submitted false claims because EHR at least acted in reckless disregard of the applicable regulations. Knowledge is a required element of relator's claims under the pre- and post-FERA versions of the FCA. See 31 U.S.C. § 3729(a)(1)-(2) (2008); 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA defines "knowingly," both before and after the FERA, as when "a person, with respect to information — 1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," without requiring "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Allegations of knowledge may be alleged generally and need not be pled with particularity. Fed. R. Civ. P. 9(b).

---

[25]      Because I find that relator has sufficiently pled falsity based on these provisions under an implied false certification theory, I need not address his alternate implied false certification arguments. See Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 71 (arguing that he has also adequately pled falsity under theories that provisions that patient treatment is "medically reasonable and necessary," that treatment is done in "the most economical setting or manner" or that a patient is admitted "only on the recommendation of a licensed practitioner permitted by the State to admit patients" are all conditions of payment).

I note that relator may also be able to support his falsity claims under an express false certification theory based on the certifications providers make in certain forms that they submit for reimbursement, but again, need not address this argument because relator has sufficiently pled falsity under an implied false certification theory. See Wilkins, 659 F.3d at 313 ("[W]e need not decide whether the amended complaint states a claim under an express false certification theory because appellants' allegations in the amended complaint clearly state a claim for relief under an implied false certification theory of liability.").

EHR argues that relator's FCA claim is "predicated on a difference of opinion regarding the interpretation of applicable regulations or guidelines," and that therefore it "does not act, as a matter of law, with the required knowledge" because its interpretation is "reasonable." Dkt. No. 52, Ex. A at 12. EHR contends that relator "focuses on how EHR physician advisors perform second level review, which involves making complex medical judgments about which reasonable minds may differ and which review is based on a reasonable interpretation of the applicable regulations and guidelines." Id. at 13. EHR concludes that this cannot be the basis for FCA liability. EHR argues that when hospitals' internal review criteria and its criteria result in divergent outcomes, this is a classic case of where "reasonable medical minds might differ." Id. at 14 (internal citations omitted). EHR concludes that because relator has failed to allege that "the recommendations are lies," relator "has not done enough to allege that EHR's recommendations are objectively or knowingly false." Id. at 15.

EHR also maintains that "an approach that considers whether a patient is ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ does inherently consider whether that patient is expected to need hospital care for 24 hours or more because, if ▮▮▮▮▮▮▮ actually occurs, the patient will need hospital care for 24 hours or more." Id. at 17. EHR argues that "the [Medicare Benefit Policy Manual] does not state that physicians must await the result of all diagnostic tests before deciding whether to order an inpatient admission" but instead that "physicians should consider the need for outpatient diagnostic studies." Id. at 17-18 (emphasis in original).

Relator argues that "if a party knows, recklessly ignores the fact, or is willfully blind to the fact that its own interpretation of the applicable statutes, regulations or agency guidance is incorrect under applicable law or agency authority, liability can, and should, attach." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 42. Relator argues that the gap between EHR's

approach to second level review "and the applicable legal requirements is so enormous, that the only plausible explanation for it . . . is that EHR knowingly ignored them . . . in order to devise a review platform that would generate vast numbers of false inpatient status certifications," especially because relator alleges "that EHR held itself out as the world's foremost authority on the interpretation of these guidelines." Id. at 44.

Relator also argues that he has alleged specific examples of EHR's awareness of how its approach maps onto the regulatory framework. He alleges that when he arrived at EHR he spoke with EHR's CCO about interpreting Medicaid's requirements and was told that ██████████

████████████████████████████████████████████████

██████████ Dkt. No. 12 at ¶ 184. Relator also alleges that EHR's then-Vice President of Operations told him that ██████████████████████████████████████████████

████████████████████████████████████████████ Id.

Relator contends that in a January 2012 email, EHR's Associate Vice President of Strategic Accounts found it ████████████████████████ after viewing a diagram from a government-approved agency highlighting that there should be a "24 to 48 hour outpatient window to assess response to therapy and complete essential diagnostic testing." Id. at ¶ 180. Relator alleges that in February 2012, after he was asked to prepare ██████████████ ████████████████████████, he explained the CMS guidelines regarding the 24-hour benchmark and the role of diagnostic testing in admissions decisions. Id. at ¶ 182. A few hours later, relator alleges that "he was instructed that he could not attend a monthly regulatory affairs meeting" and was "forbidden to discuss his concerns with members of the EHR regulatory affairs team or his former colleagues at the Medicare program." Id.

Relator also alleges that EHR's 2008 promotional materials to hospitals used to include

information about the four factors listed in the Medicare Benefit Policy Manual as considerations when determining the appropriateness of an inpatient admission, but that ███████████████

███████████████. Id. at ¶ 126. When training its physician advisors, EHR allegedly only emphasizes ███████████████ as the "key factor" contained in the Medicare Benefit Policy Manual about inpatient admissions determinations without any reference to the other factors discussed in CMS guidance. Id. at ¶ 125.

Relator's allegations of EHR's internal discussions about and promotional use of CMS guidance are sufficient to plead that EHR knew about or at least recklessly disregarded the applicable regulations in order to increase its revenue by falsely certifying some claims for hospitals to submit.[26] See United States ex rel. Chilcott v. KBR, Inc., No. 09-4018, 2013 WL 5781660, at *9 (C.D. Ill. Oct. 25, 2013) ("Plaintiff makes sufficient allegations for the Court to infer that Defendants did not simply choose, in good faith, a reasonable interpretation among equal alternatives. . . . [t]here are allegations of specific evidence of knowledge that the claim is false.") (internal citation omitted).

### 3.   False claims based on EHR's appeals of client claim denials

In a footnote of its reply brief, EHR challenges a set of false claims that relator alleges it submitted: false claims that it pursued through the administrative appeals process for its clients. Dkt. No. 78 at 6 n.8. It argues that the claims it pursued through the appeals process "are based on information disclosed in publicly available decisions of administrative law judges and the

---

[26]      Relator seems to allege that only some portion of the claims EHR has reviewed constitute knowingly false claims, while some claims out of the millions that EHR has reviewed are legitimate. Compare Dkt. No. 12 at ¶ 119 (alleging that EHR has caused the submission of "thousands upon thousands of [claims] for inpatient status that otherwise would not have qualified for such status") with id. at ¶ 121 (noting that EHR has performed over ten million case reviews for clients). However, relator does not explain in his complaint or in his briefing how he differentiates allegedly knowingly false claims from those that were properly submitted.

Medicare Appeals Council" and thus impermissible due to the public disclosure bar because relator has failed to plead that he is an "original source." Id.

Relator maintains that EHR's "fraudulent appeal submissions, which are not even publicly available, constitute actual false claims, the fraudulent nature of which is not apparent without the information" provided by the relator in his allegations and are therefore not public disclosures. Dkt. No. 84 at 13. Relator also argues that even if the appeals are deemed public disclosures, he is an original source because "he has direct knowledge that is both independent of and materially adds to the information gleaned directly from the appeal submissions, which he voluntarily provided to the government before filing this qui tam action." Id.

Neither party cites authority beyond 31 U.S.C. § 3730(e)(4), the public disclosure bar provision, addressing whether these appeals submissions are public disclosures. Because of the parties' extremely limited briefing on this issue, and because it is not apparent that relator's fraudulent appeal claims are barred by the public disclosure bar, I decline to dismiss his claims on this basis at this time.

EHR also argues that "the act of appealing an adverse payment decision constitutes government petitioning, which is protected from [FCA] liability under the Noerr-Pennington doctrine," citing U.S. ex rel. Wilson, v. Maxxam, Inc., No. 06-7497, 2009 WL 322934, at *6 (N.D. Cal. Feb. 9, 2009). Dkt. No. 78 at 6 n.8. Relator responds that even under the case EHR cites, relator's claims would not be barred. Dkt. No. 84 at 13 n.12. Based on this single case, the court in Maxxam noted that the plaintiffs sought liability against the defendants

> not for the act of 'petitioning' the government, but for specific acts committed in the course of 'petitioning' the government. That is a critical distinction . . . While citizens have a First Amendment right to petition the government, they do not have a First Amendment right to lie while doing so. Were it otherwise, application of the False Claims Act itself would, in many cases, be unconstitutional.

Maxxam, 2009 WL 322934, at *6. I will not dismiss relator's fraudulent appeals claims on this basis because relator's allegations challenge fraud committed in the course of requesting reimbursement for claims on behalf of hospital clients rather than challenging the bringing of appeals themselves.

Finally, EHR contends that relator has failed to plead this set of claims with particularity under Rule 9(b), referring to relator's allegations at Dkt. No. 12 ¶¶ 168-179. Dkt. No. 78 at 6 n.8. Without further briefing, I decline at this time to find that relator has failed to sufficiently plead the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." See Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155-56 (3d Cir. 2014) (internal citations omitted).

### 4.    State law claims

EHR argues that relator's state claims should be dismissed for the same reasons as his federal claims. Dkt. No. 52, Ex. A at 24. Defendants CHOMP and YNHH also argue in their brief that relator does not cite any state-specific regulations or standards for inpatient vs. outpatient status in his complaint to adequately allege falsity under their respective state FCA statutes. Dkt. No. 90 at 22. Relator argues that his state-specific allegations are sufficient because he has pled that "[m]ost, if not all, state Medicaid programs observe the same or comparable distinctions between hospital inpatient and outpatient hospital services as Medicare." See Dkt. No. 12 at ¶ 61.

Although relator has pled a nationwide scheme with sufficient particularity, relator must also sufficiently allege falsity under the relevant state laws in order to survive EHR's motion. Relator's single generalized allegation that "most" states recognize "the same or comparable distinctions" between inpatient and outpatient patient status is insufficient to allege falsity under

42

the requirements of dozens of particular state Medicaid programs.[27]  Therefore, I will dismiss

relator's state law claims against EHR on this basis, with leave to amend if he can sufficiently

allege falsity under the relevant state FCAs.

## II.    Defendants CHOMP and YNHH[28]

Hospital defendants YNHH and CHOMP have moved to dismiss relator's complaint on

several grounds.  They argue that relator has failed to plead fraud with particularity for either

defendant, that relator has failed to plead the falsity element required for FCA claims[29] and that

relator has failed to adequately plead knowledge.  Relator argues that he has established all of

these elements.  For the following reasons, I will grant CHOMP and YNHH's motion to dismiss

all of relator's claims against them.

### A.    9(b)

CHOMP and YNHH first argue that relator has failed to plead fraud with particularity as

required by Federal Rule of Civil Procedure 9(b).  The Court of Appeals has explained that to

---

[27]        Relator also pleads that "the various state Medicaid programs will only cover services provided to beneficiaries where such services are reasonable and necessary and provided, billed, and paid in the most economical manner." Dkt. No. 12 at ¶ 62.  However, without addressing the merits of this basis for legal falsity, I note that these provisions could only assist relator in pleading falsity if states allege certain distinctions between inpatient and outpatient services, which relator has not sufficiently pled at this stage.

[28]        Relator brings claims against YNHH and CHOMP under sections 3729(a)(1)(A)-(B) of the FCA and under analogous provisions of state FCAs. Dkt. No. 12 at ¶¶ 282, 296, 307, 317, 337, 347.  Relator argues in a footnote in his response brief that even though he has not specifically alleged violations of section 3729(a)(1)(G), "it is clear from the allegations in the [c]omplaint that the hospital defendants also violated" this provision. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 13.  Contrary to relator's assertion, relator's sixty-six count complaint, in which each count alleges claims under specific provisions in each FCA and against specific defendants, does not make it "clear" that he brings a claim under this provision of the FCA.  Relator's contention that his complaint is similar to complaints without specified counts of statutory violations or a complaint in which a claim for breach of contract could also be seen to encompass a claim for fraud when read as a whole is unavailing.

[29]        I have already responded to CHOMP and YNHH's falsity arguments in my discussion of falsity above addressing EHR's motion.  Thus, I have found that relator sufficiently pleads falsity.

43

satisfy Rule 9(b)'s particularity requirement at the pleadings stage, an FCA claimant may identify "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia, 754 F.3d at 155-56 (internal citations omitted). An FCA claimant need not plead "the exact content of the false claims in question" to survive a motion to dismiss based on Rule 9(b). Id. at 156. Relator argues that he has alleged particular details of schemes by both defendants and provided reliable indicia that lead to a strong inference that the hospitals submitted false claims.

Relator's claims against CHOMP center on its involvement with EHR beginning in September 2007. See Dkt. No. 12 at ¶¶ 220, 226. Basing his allegations on a slide presentation by CHOMP,[30] relator maintains that EHR provided second level reviews for CHOMP's cases starting in September 2007 and alleged that in its first year working with EHR, "EHR helped CHOMP increase its revenue by $6.7 million." See id. at ¶¶ 226-29.

He alleges that in that first year, EHR advised CHOMP that inpatient certification was the proper admissions status in 1,419 of 1,741 cases in which a CHOMP physician deemed an admission inpatient but that failed an internal screening by the hospital's first level review team. Dkt. No. 12 at ¶ 227. Relator also alleges that CHOMP "referred to EHR a large number of cases that it had previously billed as outpatient because they had failed" CHOMP's internal review criteria, leading EHR to certify 95% of these claims as inpatient admissions. Dkt. No. 12 at ¶ 228. Relator does not provide any additional details about the submission of these claims after EHR's certifications. Relator does not make any other time-specific allegations about

---

[30]     At numerous points in its motion to dismiss and reply brief, CHOMP makes reference to contents within the slide presentation that relator does not cite in his complaint, asking me to use its contents to rebut relator's arguments. See Dkt. No. 90 at 50. Because I find relator's complaint deficient on other grounds, I need not rely on the contents of the slide presentation to dismiss relator's claim.

CHOMP's involvement with EHR beyond 2008.

Relator's scant allegations against CHOMP are insufficient to meet the particularity requirements of Rule 9(b). CHOMP argues that relator needs to plead information about the actual patients underlying the claims, but relator need not plead "the exact content of the false claims in question" to survive a motion to dismiss based on Rule 9(b). Foglia, 754 F.3d at 156. However, relator's complaint includes numerous allegations discussing multiple hospitals other than CHOMP where EHR performed second level reviews and certified a large number of the cases it reviewed as inpatient, where its certifications were allegedly determinative of the billing outcome. See Dkt. No. 12 at ¶ 193-94. Allegations that could be applied to any of EHR's clients paired with two vague sets of cases EHR reviewed for CHOMP sometime in 2007 or 2008 are not sufficient to plead with particularity CHOMP's involvement in EHR's fraudulent scheme for nearly a decade.

Regarding YNHH, relator contends that YNHH contracted with EHR for second level reviews of cases that failed their internal review criteria for inpatient status from 2008 until "at least February 2012." Id. at ¶ 204. Relator also contends that the Associate Chief Medical Director and Care Coordinator from YNHH and the Executive Vice Present of EHR were all speakers at a case management conference in September 2009. Id. at ¶ 205. These are relator's sole allegations against YNHH prior to a government audit in December 2011. To support his claim, relator relies on his description of EHR's scheme overall to allege that "YNHH knew, or was severely reckless in not knowing, that the cases did not satisfy the Medicare and Medicaid rules and regulations for inpatient status." Id. at ¶ 206.

Relator alleges that on December 16, 2011, YNHH was subjected to a government audit for its inpatient admissions and retroactively denied "20 out of the 20 cases" the auditors

reviewed, where relator believes that "EHR had provided inpatient certifications to YNHH for these cases." Id. at ¶ 207. Relator provides examples of two of these retroactively denied claims. Id. at ¶ 208. YNHH was informed of the results of the audit and on an unspecified date and time between December 2011 and January 2012, unspecified officials from YNHH "expressed concern to EHR about whether EHR's reviews were compliant with Medicare and Medicaid rules and regulations." Id. at ¶¶ 209-10. YNHH was allegedly "so concerned" that someone from YNHH indicated to EHR in January 2012 "that there was a significant risk that YNHH would terminate its contract with EHR." Id. at ¶ 210. EHR's CCO allegedly tried to convince YNHH to continue using their services. Id. at ¶ 211. Relator then concludes that because "at the time [he] departed EHR in February 2012, YNHH was still using EHR to perform a second level review of cases that fail [internal criteria] for inpatient status" YNHH must have continued to contract with EHR after that time. Id. at ¶ 212.

Relator's allegations against YNHH can be broken into three time periods: before the audit in December 2011, between December 2011 and February 2012 when relator left EHR and after February 2012. Relator's allegations before the audit amount to YNHH contracting with EHR, paired with examples of two undated cases retroactively denied in the audit. Although relator has laid out EHR's scheme in detail, relator does not provide sufficient factual allegations that YNHH submitted false claims during the entire period between 2008 and December 2011, and the undated audit period does not therefore provide reliable indicia of when false claims may have been submitted.

During the period between December 2011 and February 2012, relator alleges that by January 2012 YNHH was seriously considering terminating its contract with EHR although EHR continued conducting second level reviews for YNHH. YNHH's continued contract with EHR

during this time period is not paired with reliable indicia that false claims were submitted during this time period, when YNHH was allegedly questioning its relationship with EHR. For the time period after February 2012, relator provides no factual allegations about YNHH, merely assuming that YNHH continued to use EHR's services after February 2012 to allege violations "from at least 2008 continuing through the present." See Dkt. No. 12 at ¶¶ 284, 298. Relator has failed to meet Rule 9(b)'s pleading requirements with respect to its allegations against YNHH.[31]

**B.      12(b)(6)[32]**

YNHH and CHOMP additionally argue that relator has not sufficiently pled that either defendant knowingly participated in EHR's alleged scheme. Relator argues that he has sufficiently pled that both YNHH and CHOMP knowingly submitted false claims. Knowledge is a required element of relator's claims under the pre- and post-FERA versions of the FCA. See 31 U.S.C. § 3729(a)(1)-(2) (2008); 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA defines "knowingly," both before and after the FERA, as when "a person, with respect to information — 1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," without requiring "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Allegations of knowledge may be alleged generally and need not be pled with particularity. Fed. R. Civ. P. 9(b).

---

[31]      YNHH and CHOMP also argue that relator's complaint fails to plead fraud with particularity because relator does not provide any examples of false Medicaid claims and because relator does not identify which California or Connecticut statutes, regulations or guidance that these defendants could have violated. See Dkt. No. 90 at 37, 39-40. I need not address this alternate argument because relator has failed to meet the standards of Rule 9(b) on other grounds.

[32]      Although I have already held that relator's complaint fails under Rule 9(b), I will also analyze the sufficiency of relator's complaint under Rule 12(b)(6).

### 1.    CHOMP

CHOMP argues that relator does not plausibly allege its knowledge of the submission of false claims.  Dkt. No. 90 at 49.  CHOMP contends that all of relator's allegations against it are based on a publicly accessible slide presentation from which relator has pulled quotes out of context.  Id. at 50-52.  CHOMP maintains that relator's argument that it knew about any false claims is at odds with relator's detailed allegations that EHR deceived hospitals into thinking that their internal review criteria were incorrect and were resulting in lost revenue for hospital clients. Id. at 52.  Additionally, CHOMP argues that EHR's decision not to share its case review criteria with a client like CHOMP is not a reason to impute its knowledge of EHR's scheme since otherwise "every person who used a product created by a process that the manufacturer protected as a trade secret would have to suspect illegality."  Id. at 53.

Relator maintains that he has pled CHOMP's knowledge of alleged false claims for three reasons.  First, relator argues that CHOMP at the very least acted in reckless disregard of allegedly false claims certified by EHR because it "wholly outsourced its hospital status billing decisions to EHR."  Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 86.  However, as CHOMP points out, relator's allegations acknowledge that for at least the time period at issue cases were only sent to EHR after an internal review team screened an inpatient recommendation from a patient's physician.  See Dkt. No. 12 at ¶ 226.  Without more, this fact alone does not support relator's argument that CHOMP knew about EHR's alleged fraudulent scheme.

Next, relator argues that CHOMP recklessly disregarded fraud when it "relied upon EHR without knowing what framework and criteria EHR was applying to decide how the hospital would bill Medicare" for claims because CHOMP had an obligation to know how EHR was reviewing its claims.  Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 86-87.  Relator

argues that "[b]illing for inpatient claims based upon EHR's inpatient certifications without knowing any details of [EHR's review criteria] is the epitome of willful blindness." Id. at 88. Relator relies on a compliance workbook which suggests that hospitals be aware of their admission screening criteria to argue that CHOMP knowingly submitted inaccurate inpatient claims. Id. at 88.

CHOMP argues that the advice of this handbook, which does not appear to be used in any payment review decisions, does not "demand that EHR reveal its specific criteria" and that regardless, this handbook was created by a private entity and does not impose a legal requirement on CHOMP. Dkt. No. 89 at 27-28. Additionally, CHOMP notes relator's extensive allegations explaining how EHR advertises itself as the national expert in compliance review with extensive support for their decisions and a high success rate on appeals. Id. at 28. Thus, the only authority relator relies on appears to be a privately-created, non-regulatory document that is not used in review decisions. Relator's allegations of how EHR represents its services to clients contradict relator's assertion of CHOMP's knowledge. CHOMP's use of EHR's services without knowing its review criteria is insufficient to adequately plead its knowledge of fraud.

Finally, relator argues that "CHOMP ignored glaring red flags that [EHR's review criteria' was causing the hospital to submit false inpatient claims." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 88. Relator maintains that the high rate of inpatient certifications by EHR in the two alleged sets of claims "should have caused CHOMP to question EHR's compliance with Medicare and Medicaid rules and regulations" because CHOMP was obligated to understand conditions of payment. Id. Relator argues that CHOMP uses its internal review guidelines when it is helpful for it, only seeking second level review by EHR when claims fail internal guidelines for inpatient admissions. Id. at 89.

CHOMP maintains that the rate of EHR's inpatient certifications that failed internal review criteria does not imply any knowledge of fraud because his notice allegation is "a legal conclusion derived from the factual allegations his pleading makes regarding the percentage of disagreement." Dkt. No. 89 at 29. CHOMP argues that assuming its knowledge of EHR's alleged fraudulent certifications stands completely at odds with relator's allegations that EHR "goes to great lengths to cause hospitals to believe that [their internal review criteria] are extremely inaccurate" and that "EHR misrepresents to prospective clients that [one set of review criteria] 'rarely qualifies' cases for inpatient status and that therefore, a second level physician review by EHR is essential for 'revenue integrity.'" See Dkt. No. 12 at ¶ 87. Additionally, CHOMP argues that under relator's allegations, EHR only reviews cases once a CHOMP physician has recommended inpatient admission. Dkt. No. 89 at 30. Paired with EHR marketing of CHOMP's internal review criteria as extremely inaccurate, this review process after a physician recommends inpatient admission makes high disagreement rates with internal criteria seem like a logical outcome rather than demonstrating CHOMP's knowledge of fraud. Thus, relator has failed to allege CHOMP's knowledge sufficiently to plead an FCA claim against CHOMP.

        **2.**    **YNHH**

YNHH also argues that relator has failed to plead its knowledge of a fraudulent scheme. Relator argues that he has sufficiently alleged knowledge both before and after the December 2011 government audit of YNHH. YNHH argues that relator "provides no factual allegations to justify his assertion that [YNHH] knowingly submitted false claims prior to the [December 2011] audit." Dkt. No. 90 at 53-54. YNHH also argues that even after the audit, "EHR went to great lengths to instill doubt in hospitals regarding the validity of such audits" and "allegedly

overstated its high level of success in appealing claim denials resulting from such audits." Dkt. No. 90 at 54, citing Dkt. No. 12 at ¶¶ 87, 173.

Relator responds that he has adequately pled knowledge both before and after the YNHH audit. Before the audit, relator supports his allegations with the argument that YNHH "has a history of billing Medicare for services that were not medically necessary or for which it was otherwise not entitled to reimbursement." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 80. Relator contends that his factual allegations of settlements that YNHH made with the government for alleged FCA violations in 2008 and 2009 support his allegations of YNHH's knowledge. See Dkt. No. 12 at ¶ 217. However, as YNHH notes, settlements are not adjudications on the merits of FCA actions against YNHH. See Dkt. No. 89 at 31. These settlements were unrelated to inpatient admission billing and relator does not allege a connection to EHR.

Relator also relies on "YNHH's sophistication with respect to the inpatient vs. outpatient determination" to support his knowledge allegations. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 84. Relator supports this argument with his allegation that two YNHH officials spoke at a September 2009 case management conference that involved discussion of compliance issues given government audits of short stays and observation status. See Dkt. No. 12 at ¶ 205. Additionally, relator argues that YNHH employees "were at least on notice of" a program in Connecticut in December 2009 held to educate Connecticut hospitals and others about "compliant determination of hospital status for chest pain." Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 84, citing Dkt. No. 12 at ¶ 147. However, combined with relator's allegations about how extensively EHR worked to convince hospitals that their internal review criteria were incorrect and that EHR had a high appeal success rate, these allegations are

insufficient to establish knowledge from 2008 until the 2011 audit.

Relator also makes allegations about a 2012 Medicare Appeals Council decision and a 2014 HHS report reviewing YNHH inpatient claims from before the audit in his brief to support his knowledge argument. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 80-82. As these allegations are absent from his complaint, I cannot consider them. See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal citations omitted). Additionally, as YNHH argues, given relator's allegations of EHR's misrepresentations about its success appealing claim denials, "[a] Council decision affirming a claim denial is completely consistent with [r]elator's central legal theory that EHR duped hospitals into believing that claim denials were often incorrect and that EHR could successfully appeal such denials." Dkt. N. 89 at 33.[33]

After the audit, relator argues that he has alleged actual knowledge of the submission of false claims. Dkt. No. 62, Rel.'s Br. Opp. EHR, YNHH and CHOMP at 84. He alleges that YNHH continued contracting with EHR through at least after EHR's CCO told an unidentified person at YNHH that "even though the government may reject inpatient claims that EHR certifies through probe and audit functions, the Government Payers will pay a substantially greater percentage without ever reviewing them, resulting in YNHH receiving millions more in reimbursements than it would without EHR." Dkt. No. 12 at ¶ 211. He also argues that EHR at least acted with reckless disregard after YNHH learned the results of the audit because twenty out of the twenty inpatient claims reviewed were retroactively denied. Id. at ¶ 207.

---

[33]     YNHH also argues that relator's reliance on the 2012 decision implicates the public disclosure bar, but I need not address this argument as I find that relator's allegations from before the audit are insufficient to establish knowledge on other grounds.

YNHH argues that YNHH's knowledge of the audit alone is insufficient to allege knowledge of fraudulent claims because of relator's allegations about EHR's misrepresentations about its success on appeal and the validity of audits. Dkt. No. 90 at 54. I agree. Yet, EHR's CCO's alleged statements to YNHH go to the heart of the alleged scheme and relator has therefore sufficiently pled YNHH's knowledge of the scheme from the time when the communication occurred — sometime after January 2012 — onward. Rather than touting EHR's success rates or disparaging faulty audits, the alleged statement communicated to YNHH that it should keep working with EHR because enough claims would evade review to recoup any losses from claims denied in audits or on appeal. Thus, relator has sufficiently pled YNHH's knowledge of the scheme from the date of this communication onward. However, because I have found that relator has failed to plead fraud with particularity against YNHH, all claims against YNHH both before and after the audit must be dismissed.[34]

### III.    Defendants UHG, UHCS, Optum and OptumInsight

Defendants UHG and its subsidiaries, UHCS, Optum and OptumInsight have moved to dismiss all of relator's claims against them on several grounds. UHG and its subsidiaries argue that relator "fails to allege adequately that any of [them] caused the submission of false claims or participated in the creation of a false record" or that piercing the corporate veil is appropriate to hold them liable as EHR's parent companies. Dkt. No. 51 at 1. Relator maintains that he has

---

[34]    EHR argues that dismissing relator's claims against YNHH and CHOMP necessarily requires dismissing relator's claims against EHR for those cases it participated in reviewing at YNHH and CHOMP that allegedly led to the filing of false claims because relator's theory of liability against EHR is predicated on its "causing" the submission or use of false claims by hospitals. See Dkt. No. 78 at 3 n.3. Relator's failure to sufficiently allege particularized details of YNHH and CHOMP's involvement in EHR's scheme prevents holding them liable on the basis of relator's complaint. However, EHR may still be liable for FCA violations regardless of the liability of its client hospitals. As the parties have not addressed this point further, at this stage I decline to dismiss relator's claims against EHR of alleged FCA violations resulting from EHR's reviews of admissions decisions at CHOMP and YNHH.

made specific and individualized factual allegations sufficient to survive a motion to dismiss against UHG and its subsidiaries. For the following reasons, I will grant UHG, UHCS, Optum and OptumInsight's motion to dismiss.

### A.   Direct Liability

Relator first argues that UHG, UHCS, Optum and OptumInsight can individually be held liable for direct violations of the FCA. UHG and its subsidiaries contend that relator's complaint does not allege any direct knowledge or participation by any of EHR's parent companies in its alleged scheme. I find that relator's complaint does not state a claim against UHG or its subsidiaries under a direct liability theory.

UHG and its subsidiaries argue against direct liability by maintaining that relator's complaint does not sufficiently allege each entity's knowledge of EHR's alleged scheme. They also argue that relator fails to state a claim against them because he has failed to adequately plead causation. The FCA's provisions on liability for those who cause false claims to be presented "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243 (3d Cir. 2004), citing U. S. ex rel. Marcus v. Hess, 317 U.S. 537, 544 (1943), superseded by statute on other grounds as recognized in Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 412 (2011).

Relator claims that his allegations show "that the UHG Defendants were [not] merely aware of EHR's fraudulent scheme, but that they researched it, purchased it, and then took numerous affirmative steps to integrate EHR within their corporate structure to maximize EHR's reach and illegal profits." Dkt. No. 62, Rel.'s Br. Opp. UHG Defs. at 17-18. Relator argues that

he can show that UHG and its subsidiaries knowingly assisted in causing fraudulent claims to be submitted for payment through his allegations that UHG and its subsidiaries conducted extensive due diligence before acquiring EHR, integrated EHR into their management and business operations, performed joint marketing efforts and had knowledge of the relevant Medicare and Medicaid standards with which EHR needed to comply, as well as alleging that EHR made these defendants' other products more profitable. Id. at 3-11. Relator maintains that these allegations show "a coordinated effort by the UHG Defendants in which various subsidiaries were utilized to undertake certain aspects of the fraudulent scheme at various times." Id. at 16.

UHG and its subsidiaries argue that they did not have knowledge of EHR's scheme, but that even if they knew, each defendant's level of participation in EHR's scheme is insufficient to hold them directly liable under the FCA. Numerous courts have held that some level of direct involvement in causing the submission of false claims to the government is necessary for direct liability under the FCA. See U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 62 (D.D.C. 2007) (stating that "merely [b]eing a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation") (internal citations omitted); United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 186-87 (D. Mass. 2004) ("To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required."); see also U.S. ex rel. Schaengold v. Mem'l Health, Inc., No. 4:11- 58, 2014 WL 6908856, at *14 (S.D. Ga. Dec. 8, 2014) (finding that "without allegations sufficient to support a finding that [any defendant] actually submitted a falsely certified cost report, or was directly involved in causing such a submission, there is

simply no actionable damage to the public fisc as required under the False Claims Act") (internal citations omitted).

Inaction despite knowledge of an alleged fraudulent scheme is distinguishable from direct participation in a scheme. See U.S. ex rel. Bartlett v. Tyrone Hosp., Inc., 234 F.R.D. 113, 125-26 (W.D. Pa. 2006) (noting that although "it may be disturbing to some to find that a management entity who is aware of [an illegal scheme] would not be liable for those illegalities," allegations that a corporate defendant and its parent company "stood and watched as the other [d]efendants are alleged to have taken actions that defrauded the Government" were insufficient because "[n]o liability attaches under the FCA for their inaction"); see also U.S. ex rel. Piacentile v. Wolk, No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995) ("An individual's failure to inform the government of false statements made by another does not constitute fraud.").

Relator contends that he has alleged both knowledge of and participation in EHR's scheme by UHG and its subsidiaries. However, the cases upon which relator primarily relies all involve a more substantial level of direct involvement in an alleged fraudulent scheme. For example, the defendant in Schmidt, 386 F.3d at 244, allegedly directly created and pursued a marketing kickback scheme targeting health care providers and causing them to file false claims that did not report the kickbacks. See also U.S. ex rel. Bates v. Dentsply Int'l, Inc., No. 12-7199, 2014 WL 4384503, at *7 (E.D. Pa. Sept. 4, 2014) (finding that relators stated a claim for direct FCA liability after alleging that defendant "caused" medical providers "to submit legally false claims to government healthcare programs by providing bribes and kickbacks" to them). Similarly, the Court in Hockett, 498 F. Supp. 2d at 62, found that an issue of material fact existed over a parent corporation's liability when relator possessed evidence that the parent company "was directly involved in the process of finalizing [a] cost report and billing the government,"

56

including evidence that a corporate official instructed an employee to "obscure the true nature of the cost overstatements."

In another case relied on by relator, United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 186-87 (D. Mass. 2004), the Court discussed potential liability for an "ostrich-like" defendant who knows about the submission of false claims but "does not cease doing business with the claimant or disclose the false claims to the United States." The Harvard Court held one defendant liable who approved project expenses and knew of the project's government source of funds. Harvard, 323 F. Supp. 2d at 187-89. In contrast, the Harvard Court found that a defendant who did not approve expenses "did not take any actions to have claims submitted to the government" because even if he "knew or should have known about the claims process, and even if he knew that false claims were going to be submitted, his failure to take steps" to end the submission of false claims "does not constitute 'causation' under the False Claims Act." Id. at 188-89.

Relator's allegations against UHG and its subsidiaries are substantially different from the examples of direct involvement in a fraudulent scheme in the authorities he cites.[35] Although relator alleges that these defendants have benefitted from EHR financially, that some of these

---

[35]     Relator alleges that defendant UHG had knowledge of EHR's scheme or recklessly disregarded EHR's scheme after completing due diligence and that he put UHG on notice himself, that UHG financially benefits from EHR's success and that EHR's employees became UHG employees after OptumInsight acquired it. Dkt. No. 12 at ¶¶ 245, 247, 253, 259, 261, 266, 270. Relator contends that UHCS conducted due diligence before EHR was acquired, that several EHR employees became UHCS employees after acquisition and that UHCS must be aware of EHR's scheme due to its knowledge of the criteria generally used to evaluate patient admissions. Id. at ¶¶ 246, 253-54, 263-64. An officer at Optum has allegedly represented being EHR's President and Optum allegedly markets and promotes EHR's services. Id. at ¶¶ 250, 256, 258. Finally, relator alleges that OptumInsight acquired and has marketed and promoted EHR, that OptumInsight has shared managers and officers with EHR and that an officer at OptumInsight is allegedly a faculty member at an EHR-managed educational institution. Id. at ¶¶ 239, 248-49, 251-52.

defendants have knowledge of EHR's practices and that some defendants have overlapping employees, managers or officers, such connections are too far removed to establish direct involvement in a scheme subject to FCA liability. See Schaengold, 2014 WL 6908856, at *11 (finding shared centralized leadership and management between a parent, associated corporations and a subsidiary "insufficient" to hold the parent or associated corporations directly liable for the subsidiary's alleged false claims under the FCA); Bartlett, 234 F.R.D. at 125-26 (noting that despite the defendants' "alleged 'expertise' in 'compliance' . . . and knowledge of the alleged illegal schemes . . . [they] did not contract with the Government for reimbursement of the claims at issue and, assuming as true that they knew of this illegal scheme being conducted within the corporate entity they managed, this knowledge does not equate to causing the false claims and submission of false records").

Relator's allegations about Optum and OptumInsight's marketing and promoting of EHR's services — which would allegedly make false certifications of patient admission status for medical clients, who would in turn rely on those certifications to file fraudulent claims with the government— do not constitute sufficient involvement. In contrast to the defendants in Schmidt and Dentsply, who supposedly carried out fraudulent schemes by directly inducing medical providers to submit false claims through kickbacks, Optum and OptumInsight's marketing efforts are too far removed. See Schmidt, 386 F.3d at 244; Dentsply, 2014 WL 4384503, at *7. Relator has not alleged a sufficient link between any of these defendants and the submission of false claims to state a claim for direct liability under the FCA. See U.S. ex rel. Lisitza v. Par Pharm. Companies, Inc., No. 06-06131, 2013 WL 870623, at *5 (N.D. Ill. Mar. 7, 2013) ("[T]he complaint does not allege facts that the scheme itself was controlled or directed by

[the parent companies — ]just that they had control over [the subsidiary] in a general sense.")
(emphasis in original).

### B.    Veil Piercing

Relator also contends that UHG and its subsidiaries can be held liable for alleged FCA
violations by piercing the corporate veil. UHG and its subsidiaries argue that relator has failed to
make allegations that would allow the corporate veil to be pierced once — let alone several times
— to hold any of these defendants liable for EHR's alleged FCA violations. I find that relator's
complaint does not state a claim against UHG or any of its subsidiaries under a veil-piercing
theory.

Both relator and defendants rely on a federal common law test for piercing the corporate
veil outlined by the Court of Appeals.[36] United States v. Pisani, 646 F.2d 83, 86 (3d Cir. 1981)
("[F]ederal law governs questions involving the rights of the United States arising under
nationwide federal programs."), quoting United States v. Kimbell Foods, Inc., 440 U.S. 715, 726
(1979). Liability is not imposed on a parent corporation for the acts of its subsidiary merely
because a parent company's directors also serve as directors of a subsidiary. See United States v.
Bestfoods, 524 U.S. 51, 69 (1998). Veil-piercing is appropriate, however, when a parent "so
dominated the subsidiary that it had no separate existence" or to "prevent fraud, illegality, or
injustice, or when recognition of the corporate entity would defeat public policy or shield
someone from liability for a crime." Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d
Cir. 2001) (internal citations omitted).

---

[36]       Because relator has also brought claims under state law against UHG and its
subsidiaries, defendants have also cited the virtually identical state law tests for veil-piercing in
Delaware and Minnesota, where UHG and its subsidiaries are incorporated. See Dkt. No. 51 at
10-11 n.7. Because I find that relator has failed to state a claim under the federal common law
test, he has also failed to state a claim under these analogous state law standards.

A party seeking to pierce the corporate veil must "essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." Id. at 485. Courts must examine the following factors when deciding whether to pierce the corporate veil:

> gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder.

Id. at 484-85. Additionally, the situation "must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness." United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981) (internal citations omitted). No "proof of actual fraud" is required to pierce the corporate veil. Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003).

These factors do not constitute "elements of a rigid test." Id. Instead, the key inquiry is "into whether the debtor corporation is little more than a legal fiction." Pearson, 247 F.3d at 485.

Relator argues that the veil should be pierced here because UHG and its subsidiaries "[i]gnored [t]he [c]orporate [d]istinctions" between them and EHR. Dkt. No. 62, Rel.'s Br. Opp. UHG Defs. at 19. Relator argues that his factual allegations that UHG and its subsidiaries integrated EHR into its business model and used EHR to financially benefit from its alleged fraud, while being involved in EHR's business affairs and promoting EHR through joint marketing efforts, suffice to pierce the corporate veil. Id. at 20.

UHG and its subsidiaries contend that relator's allegations fall far short of what is

60

required to pierce the corporate veil between EHR and its parent companies. They argue that "the only facts [relator] pleads about the UHG [d]efendants suggest that corporate formalities were respected" by placing "trusted employees in management positions at a subsidiary," "promoting a subsidiary's products on a corporate website" and "promising to investigate allegations of abuse at a subsidiary." Dkt. No. 51 at 11.

Cases within this Circuit have found veil-piercing appropriate where some of the eight factors for veil-piercing have been met. See Pisani, 646 F.2d at 88 (affirming the piercing of a corporate veil where facts showed that a corporation was undercapitalized, corporate formalities were not observed, the corporation became insolvent and there was evidence of siphoning of corporate funds); Atl. Richfield Co. v. Blosenski, 847 F. Supp. 1261, 1281 (E.D. Pa. 1994) (piercing the corporate veil of several corporations that were formed with little capitalization and where corporate formalities were not observed, two individuals constituted all of the officers of the corporations and the corporations appeared to function as "mere shells" of the defendant); United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1105 (D. Del. 1988) aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp., 879 F.2d 857 (3d Cir. 1989) (piercing the corporate veil where a subsidiary was undercapitalized, corporate formalities were not observed, the subsidiary was insolvent, the subsidiary did not pay dividends and defendants were siphoning funds from the subsidiary, using it as "an incorporated pocketbook" that was "merely a facade for defendants' operations") (internal citations omitted); cf. United States v. Chubb Inst., No. 06-3562, 2010 WL 1076228, at *13 (D.N.J. Mar. 22, 2010) (finding allegations in an FCA case that a parent company wholly controlled, managed and directly benefitted from a subsidiary that it had created insufficient to state a claim for veil-piercing).

In contrast, relator's allegations make no reference to undercapitalization, breaches of

61

corporate formalities, dividend nonpayment, insolvency, siphoned funds, nonfunctioning officers or a lack of corporate records. While relator has alleged EHR's integration into the UHG corporate structure, relator does not allege that EHR — which allegedly began and orchestrated a fraudulent scheme years before its acquisition by OptumInsight — is a facade for UHG or any of its subsidiaries.[37] Relator has failed to allege facts that any combination of UHG and its subsidiaries, including EHR, "actually functioned as a single entity and should be treated as such" for liability under a veil-piercing theory. Pearson, 247 F.3d at 485.

Relator must also allege facts to support an element of injustice or fundamental unfairness. Relator maintains that "the element of fundamental unfairness is present where the UHG [d]efendants ignore their corporate separateness when it suits their business needs yet seek to use the corporate form to 'shield themselves from liability.'" Dkt. No. 84 at 22-23, quoting Golden Acres, 702 F. Supp. at 1106. However, in Golden Acres the reason the Court found it would be problematic to prevent piercing the corporate veil is because the defendants had led the company to insolvency and were "trying to rely on the very entity they ignored to shield themselves from liability to the corporation's creditors." Id.; see also Lutyk, 332 F.3d at 198 (affirming a conclusion that fundamental unfairness would result if the corporate veil was not pierced where a company's "obligations to its creditors grew" while the defendant continued to withdraw money from the company). UHG and its subsidiaries argue that relator has failed to

---

[37]      Relator heavily relies on one case outside of this Circuit to support his argument that his allegations are sufficient to state a claim for veil-piercing, U.S. ex rel. Jamison v. McKesson Corp., No. 2:08-214, 2012 WL 487998 (N.D. Miss. Feb. 14, 2012). However, the Court in McKesson relied on a different standard to conclude that the relator's veil-piercing claim survived summary judgment and did not discuss the factors that must be examined in this Circuit. 2012 WL 487998 at *8-9. Additionally, in McKesson, there was evidence that the parent company actively managed its subsidiary's business strategy, financial goals and key business decisions and that it blurred the distinctions between the companies to another defendant. Id.

plead injustice because he has not alleged facts to support any of the veil-piercing factors and "does not allege that EHR is insolvent or would be otherwise unable to satisfy a judgment." Dkt. No. 70 at 12. I agree. Relator has not alleged facts from which injustice would result if EHR's alleged fraudulent scheme was treated as its own.

Finally, realtor argues for veil-piercing under a theory that "the failure to do so would lead to circumvention of a statute or avoidance of a clear legislative purpose." Dkt. No. 62, Rel.'s Br. Opp. UHG Defs. at 22. Relator argues that he has alleged facts to support this theory for veil-piercing. Id., citing Pisani, 646 F.2d at 88. In Pisani, the Court of Appeals noted that in addition to meeting the alter ego test for veil piercing, the corporate veil could be pierced to reach a defendant where "the Medicare statute can be circumvented if he is not personally liable." 646 F.2d at 88. The Court noted that failing to hold the defendant personally liable would circumvent the statute because it would be difficult to prevent or prove fraud without corporate records and an undercapitalized company with little or no equity could avoid repayment despite fraud. Id. at 88-89.

Unlike Pisani, relator has alleged a well-documented scheme by EHR and has not alleged any facts suggesting that holding EHR liable without its parent companies would prevent a full recovery if relator succeeds. Relator has not alleged facts to support piercing the corporate veil under either veil-piercing theory. Therefore, relator's claims against UHG and its subsidiaries must be dismissed. However, only to the extent that relator can plead sufficient facts upon which to do so, relator will be granted leave to amend his claims against UHG and its subsidiaries.[38]

---

[38]    UHG and its subsidiaries also argue that relator has not made sufficiently particularized allegations against each defendant individually to hold them responsible pursuant to Rule 9(b). They maintain that relator's allegations too frequently rely on the catch-all phrase "the UHG Defendants" without specifying how each entity has allegedly participated in EHR's scheme after OptumInsight acquired EHR. Relator argues that he has made numerous individual

63

## CONCLUSION

For the reasons stated above, EHR's motion to dismiss counts all counts against it will be granted in part and denied in part. I will dismiss relator's state law claims against EHR; in all other respects EHR's motion will be denied. YNHH and CHOMP's motion to dismiss counts all counts against them will be granted. UHG, UHCS, Optum and OptumInsight's motion to dismiss all counts against them will be granted. Relator has voluntarily dismissed all of his claims under the New Mexico Medicaid False Claims Act in Counts XLVII and XLVIII. Relator will be granted leave to amend his complaint on all dismissed counts that he has not voluntarily dismissed.

An appropriate Order follows.

---

allegations against UHG and its subsidiaries as well as allegations that apply to all of these defendants as a group. I note only that if relator chooses to amend his complaint to re-assert these claims and only if there is a factual basis upon which to do so, relator's allegations against UHG and its subsidiaries must be particularized in order to state a claim against each defendant.