# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JESSE POLANSKY M.D., M.P.H., et al. <br><br> v. <br><br> EXECUTIVE HEALTH RESOURCES, INC., et al. | CIVIL ACTION <br><br> NO. 12-4239 |

## MEMORANDUM RE: MOTION TO DISMISS SUPPLEMENTAL COMPLAINT

**Baylson, J.**                                                                                                     **March   19  , 2018**

## I. Introduction

In this False Claims Act *qui tam* action, Defendant Executive Health Resources (EHR) has moved to dismiss Relator Jesse Polansky's Supplemental Complaint, which details what Relator learned about Defendant's practices relating to inpatient classification at client hospitals after Relator left his job at Defendant. The Supplemental Complaint was allowed by this Court on November 7, 2017. (Order Allowing Supp. Compl., ECF 198.) For the reasons that follow, the Court **DENIES** Defendant's motion to dismiss the Supplemental Complaint.

## II. Background

The following facts are taken as true from Relator Jesse Polansky's Supplemental Complaint (ECF 175-2), with occasional reference to the Second Amended Complaint (ECF 12; 101) for context and clarity. The Second Amended Complaint describes what Relator learned as an EHR employee about Defendant's nationwide scheme to provide client hospitals with certifications of inpatient status for Medicare patients—more lucrative than providing the same care to a patient classified as an outpatient—that violated or ignored relevant Medicare rules. (Id.) The client hospitals would submit Medicare reimbursement claims for inpatient care, which were typically accepted, without including the certification from Defendant. (Id. ¶¶ 2, 114, 120.)

As described in the Supplemental Complaint, Relator held three different jobs in the health care industry after leaving employment with Defendant that led him to believe that Defendant continued to improperly certify hospital patients as inpatients in violation of Medicare rules. Relator worked at Health Management Systems between the fall of 2012 and the summer of 2013; at Holy Spirit Health Systems between December 2013 and May 2014; and at Summit Health between April/May 2015 and August 2015. (Supp. Compl. ¶ 1.)

At Health Management Systems, Relator "reviewed numerous examples of EHR's false inpatient certifications and its related appeals for inpatient payment." (Id. ¶ 2.)

Defendant contracts with hospitals, including, at the relevant times, Relator's former employers Holy Spirit and Summit Health, to review inpatient/outpatient classifications for Medicare cases, and to appeal Medicare denials when Medicare denies payment for a claim. (Id. ¶¶ 2, 6-7.) According to a 2013 presentation made by Defendant's Chief Medical Officer, Defendant recommends that client hospitals refer all cases that fail "screening for inpatient status under Utilization Management Criteria (InterQual and/or Milliman)" for EHR review; after review, the attending physician "changes the order" for outpatient or inpatient status, "as appropriate." (Id. ¶ 10.)

Defendant markets itself as a compliance expert, which can simultaneously help client hospitals navigate Medicare rules while increasing revenues for the hospital, particularly by billing more lucrative inpatient Medicare claims. (Id. ¶¶ 16-20.) One presentation delivered by Defendant's Chief Medical Officer in 2013 described Defendant's business model:

> for a hospital with 5,000 commercial-payor cases per year, EHR's physician advisor review services could increase that hospital's revenues by between $1.6 million and $3.5 million by using EHR's certifications for inpatient billing. Wuebker's analysis assumed that 20% (1,000) of the hospital's cases would fail initial UM Criteria screening and be sent to EHR, and that EHR would certify 75% (750) of those cases for inpatient status. Since EHR would only charge the

hospital $290,000 in fees ($290 per review), the hospital would achieve a "Return on Investment" of 5.5x to 12x.

(Id. ¶ 16.) To generate its classifications, Defendant employs secret "EHR Logic," whose components include, among other things, a proprietary clinical classification system known as "EHR Clinical Groups" ("ECGs") and ECG Guidance Documents, Defendant's proprietary case review criteria. (Id. ¶ 19.) As of September 5, 2017, Defendant boasted some 2,300 hospitals and 300 health care systems as clients across the country, according to its website. (Id. ¶ 18.)

Between December 2013 and May 2014, Relator worked as the Chief Physician Advisor at Holy Spirit Health System, a 300-bed community hospital near Harrisburg, Pennsylvania, which contracted with Defendant to perform Medicare case reviews and to appeal Medicare denials. (Id. ¶¶ 1, 32.) As part of his job, Relator led "efforts to ensure that Holy Spirit correctly assigned hospital status (i.e., inpatient vs. outpatient) for billing purposes" and "was tasked with reviewing EHR's performance under its contract with Holy Spirit." (Id. ¶ 37.)

Holy Spirit sent all Medicare cases "that failed initial InterQual screening for inpatient status to EHR for review." (Id. ¶ 32.) Because Holy Spirit had effectively delegated its internal Utilization Review committee's oversight function to Defendant, Defendant's classifications of outpatient, inpatient, or observation status were determinative of the claims that were submitted. (Id. ¶ 36.) Defendant kept a document, attached to the Supplemental Complaint as Exhibit 2, in which Defendant described the treating physician for each patient as "extremely cooperative," "cooperative," or "uncooperative"—which Relator interprets as describing the physician's willingness to change orders to accede to Defendant's inpatient classifications. (Id. ¶ 34.) The director of hospitalists at Holy Spirit admitted to following Defendant's classification recommendations "100% of the time." (Id. ¶ 51.) When submitting reimbursement claims to Medicare for patients certified by Defendant as inpatient, Holy Spirit submitted Form CMS-1450

3

for each claim, in which it certified that "the billing information as shown on the face hereof is true, accurate and complete"; and "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." (Id. ¶ 45 n.11.)

Relator had access to an online "Dashboard" that allowed him to track Holy Spirit cases referred to Defendant; during the period from February 1, 2013 to January 31, 2014, fully 78% of cases initially coded by Holy Spirit physicians as inpatient that failed InterQual screening for inpatient status were coded by Defendant as inpatient. (Id. ¶¶ 38-39.) For that same time period, a further 32% of cases initially certified as being in "observation" status and 55% of cases certified as outpatient were certified by Defendant as inpatient. (Id. ¶ 40.) In January 2014, after the adoption of the so-called "two-midnight rule" by the Center for Medicare and Medicaid Services (CMS) in August 2013 mandating that patients be classified as inpatients only if their hospital stay was expected to cross two midnights, 82% of cases initially coded by Holy Spirit physicians as inpatient that failed InterQual screening for inpatient status were coded by Defendant as inpatient. (Id. ¶¶ 23, 41.)

As part of his work at Holy Spirit, Relator conducted a "detailed retrospective review of short-stay medical and minor procedure cases which EHR had certified as inpatient." (Id. ¶ 37.) At some point, Holy Spirit executive staff began having concerns about the potential falsity of Defendant's inpatient certifications, and commissioned one of Defendant's competitors to conduct a retrospective review of certain cases, including one 2012 cardiac case coded by Defendant as inpatient, which Holy Spirit billed as an inpatient claim but which the competitor corporation stated should have been coded as outpatient. (Id. ¶ 42-45.)

Relator raised his concerns to Holy Spirit's Chief Financial Officer about the "compliance and financial risk" created by billing Medicare cases as inpatient in accordance with

4

Defendant's recommendations, as well as Defendant's practices in bringing Medicare appeals of Medicare denials on behalf of Holy Spirit. (Id. ¶ 48.) In particular, he was concerned that "appellate arguments for both medical and minor procedure focus entirely on latent risk" in disregard of the two-midnight rule, and Defendant used "standardized, boilerplate arguments for each case category" rather than crafting individualized arguments for each appeal, and misrepresent information and conclusions in the medical literature. (Id. ¶ 49.) Holy Spirit terminated its contract with Defendant in November 2016. (Id. ¶ 48.)

Relator worked as Medical Director for Care Management at Summit Health, a two-hospital health system near Chambersburg, Pennsylvania between April/May 2015 and August 2015. (Id. ¶ 57.) During that time, Summit Health was a client of Defendant and sent "all Medicare cases that failed initial InterQual screening for inpatient status" to Defendant for review, approximately 120-170 cases per month. (Id.) While Relator worked at Summit Health, Summit Health accepted all of Defendant's inpatient Medicare certifications and billed all of those cases as inpatient. (Id. ¶ 61.) In so doing, Summit Health submitted Form CMS-1450 for each claim, in which it certified that "the billing information as shown on the face hereof is true, accurate and complete"; and "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." (Id. ¶ 63.)

As Medical Director for Care Management, Relator chaired the committee responsible for reviewing Summit Health's inpatient determinations for Medicare, and reviewed "numerous" inpatient certifications made by Defendant in Medicare cases. (Id. ¶ 58.) As a result of the review he conducted for Summit Health, Relator "learned that EHR was continuing to employ essentially the same fraudulent certification criteria that he had observed during his previous employment at EHR and at Holy Spirit." (Id. ¶ 59.) Because, in Relator's experience, only very

5

few cases that fail the initial inpatient screening criteria should be certified as inpatient, Defendant "fraudulently approved inpatient certification" in a large number of Summit Health's Medicare cases. (Id. ¶ 60.)

Toward the end of the Supplemental Complaint, Relator makes a number of more general assertions. First, he asserts that Defendant is seeing less success in appeals of Medicare denials on behalf of client hospitals both before Administrative Law Judges, (the third of five levels of review of claim denials) and before the Medicare Appeals Council, the final level of review. (Id. ¶¶ 67-73.) Relator asserts that Defendant's recent lack of success before Administrative Law Judges is in part a result of increased participation by CMS in proceedings. (Id. ¶ 69.) Relator also places Defendant's "plummeting" reversal against the backdrop of larger campaigns against waste, fraud, and abuse in Medicare. Finally, he asserts that Defendant's scheme to certify Medicare patients improperly as inpatients is ongoing. (Id. ¶ 82.)

### III. Procedural History

On July 26, Relator filed a sealed Complaint, which was served on the United States. (ECF 1.) On June 12, 2013, Relator filed an Amended Complaint. (ECF 9.) On March 25, 2014, Relator filed the Second Amended Complaint, the operative Complaint in this litigation. (ECF 12.) The United States filed a notice of its election not to intervene on June 27, 2014 (ECF 19); thereafter, the Second Amended Complaint was served on Defendant.

As discussed above, the Second Amended Complaint described a nationwide scheme in which client hospitals contracted with Defendant to review decisions of inpatient/outpatient status for Medicare purposes, and Defendant, disregarding Medicare rules, caused patients to be certified as inpatient, resulting in the submission of false claims. (ECF 101.) The Second Amended Complaint alleged some fifty-six causes of action against Defendant Executive Health

Resources, two EHR client hospitals, and several of EHR's corporate parents under the federal False Claims Act and numerous state equivalents. (Id.)

On December 29, 2014, EHR, the EHR client hospitals, and EHR's corporate parents moved separately to dismiss the Second Amended Complaint. (ECF 52-1, 54, 51.)

In a memorandum dated May 10, 2016, Judge O'Neill dismissed all state law claims alleged by Relator, and all claims as to all defendants save EHR. (Mem. re Mot. to Dismiss 2d Am. Compl., ECF 93.) However, Judge O'Neill denied the motion to dismiss Relator's claims under the federal False Claims Act as to Defendant Executive Health Resources, which remains the only Defendant before this Court. (Id.) In the discussion of whether Relator had plausibly alleged that Defendant had caused hospitals to file legally false claims, the Court ruled, "Under the facts relator has alleged, it is plausible that 'if the government knew' that certain factors discussed in CMS guidance for determining inpatient status are rarely or never considered when examining EHR's certifications in the aggregate, it 'might cause [the government] to actually refuse payment.'" (Id. at 36-37 (quoting U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 309 (3d Cir. 2011)).

The memorandum specified that the Court would allow Relator leave to amend (id. at 64), but Relator did not do so, despite twice receiving extensions of time to file an amended complaint (Orders Granting Extensions of Time to Amend, ECF 96, 112.)

This case was reassigned by order of the Clerk of Court to the Honorable Michael M. Baylson on May 15, 2017. (Reassignment Order, ECF 141.)

On May 12, 2017, Defendant moved for phased discovery and for expedited summary judgment. (ECF 139.) After the parties had completed their briefing on the motion for phased discovery and expedited summary judgment, the United States filed a statement of interest (ECF

152) in which the United States expressed no view on the merits of Relator's claims, but took issue with certain positions taken by Defendant in its reply brief, including its characterization of the Third Circuit's recent decision in United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481 (3d Cir. 2017).

On September 11, 2017, while Phase 1 discovery was ongoing, Relator sought leave to file a Supplemental Complaint under Rule 15(d) detailing what Relator had learned regarding Defendant's practices after leaving employment at Defendant, and alleging that Defendant continued to be engaged in an ongoing fraudulent scheme improperly to code Medicare patients as inpatients. (Supp. Compl., ECF 175-2.) After briefing was completed, the Supplemental Complaint was allowed by this Court on November 8, 2017. (Order Allowing Supp. Compl., ECF 198.)

Defendant moved to dismiss the Supplemental Complaint on October 11, 2017. (Mot. to Dismiss Supp. Compl. ("Def. Br."), ECF 191.) Relator filed a brief in opposition on November 15, 2017. (Opp. to Mot. to Dismiss Supp. Compl. ("Rel. Br."), ECF 199.) Defendant filed a reply on November 30, 2017. (Def. Reply, ECF 202.) The motion to dismiss the Supplemental Complaint is now ripe for decision.

## IV. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, (2007)). On a motion to dismiss under Rule 12(b)(6), this Court may consider the allegations contained in the

8

complaint, exhibits attached to the complaint, and matters of public record. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

*Qui tam* actions brought pursuant to the False Claims Act must be pled with particularity pursuant to Fed. R. Civ. P. 9(b). Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155 (3d Cir. 2014). To satisfy Rule 9(b), an FCA claimant must "allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" Id. (quoting U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).

The Court considers the allegations in the Supplemental Complaint "together with the original allegations" contained in the Second Amended Complaint. U.S. ex rel. Galmines v. Novartis Pharm. Corp., 88 F. Supp. 3d 447, 458 (E.D. Pa. 2015).

**V.     Discussion**

The False Claims Act (FCA) creates liability under federal law for any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
…
(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

31 U.S.C. § 3729. A private party may bring a civil action for a violation of 31 U.S.C. § 3729. 31 U.S.C. § 3730(b). "When a private person brings an action under § 3730(b), the Government may elect to 'proceed with the action,' § 3730(b)(4)(A), or it may 'declin[e] to take over the action, in which case the person bringing the action shall have the right to conduct the action,' § 3730(b)(4)(B)." Rockwell Int'l Corp. v. United States, 549 U.S. 457, 477 (2007). "A False

Claims Act violation includes four elements: falsity, causation, knowledge, and materiality." United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481, 487 (3d Cir. 2017).

**A. Materiality**

Defendant argues that the Supplemental Complaint fails to allege materiality, a necessary element of a claim under the federal False Claims Act, as recently interpreted by Universal Health Servs., Inc. v. United States ex. rel. Escobar, 136 S. Ct. 1989 (2016) and United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481 (3d Cir. 2017), especially because the events detailed in the Supplemental Complaint occurred after Relator had served the initial complaint on the United States.

Relator correctly asserts that the allegations contained in the Supplemental Complaint must be read in conjunction with the allegations contained in the Second Amended Complaint. The Court finds that Relator meets the standard for pleading materiality set forth in Escobar and Petratos. Relator also correctly argues the unsworn allegations of Defendant that the United States was already investigating Defendant at the time of the events detailed in the Supplemental Complaint should not be considered when deciding the motion to dismiss, which should properly be confined to the four corners of the Supplemental Complaint. Defendant can raise these issues after discovery by a motion for summary judgment.

Particularly because of the concerns raised by the United States in its statement regarding Defendant's characterization of case law at an earlier stage of the proceedings (ECF 152), some discussion of the two most recent and relevant precedents is warranted.

**1. Universal Health Servs., Inc. v. United States ex. rel. Escobar, 136 S. Ct. 1989 (2016)**

Escobar was a False Claims Act case brought by parents whose daughter had died after receiving mental health treatment at a clinic where providers had misrepresented their qualifications. Id. at 1997. The relators argued that the state Medicaid program would not have paid the claims had it known that the services were provided by unlicensed staff. Id. at 1998.

The district court dismissed the complaint, finding that none of the regulations that the health center had allegedly violated was a condition of payment. Id. at 1998. The First Circuit reversed the district court's dismissal, holding that the clinic had violated state Medicaid regulations that "clearly impose[d] conditions of payment," which in the First Circuit's view, was "dispositive evidence of materiality." Id. (quoting United States v. Universal Health Servs., Inc., 780 F.3d 504, 513, 514 (1st Cir. 2015)).

A unanimous Supreme Court reversed the opinion of the First Circuit, and remanded for further proceedings. Id. at 2004. The Supreme Court held that "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Id. at 1996. The Court drew on definitions of the term "material" elsewhere in the False Claims Act and in tort and contract law; all of these definitions rested on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 2002 (citation omitted). It explained the inquiry courts were to consider in gauging whether a complaint has met the "demanding" materiality standard:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were

11

violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Id. at 2003-04. The Court added in a footnote that "False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." Id. at 2004 n.6.

### 2. United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481 (3d Cir. 2017)

Petratos concerned allegations that the company responsible for developing a cancer drug, Avastin, had suppressed research regarding Avastin's side effects, and had not reported the information to the FDA. Id. at 485. As a result of the alleged data suppression, the relator argued, the defendant company caused doctors to "submit Medicare claims that were not 'reasonable and necessary.'" Id. The district court dismissed the complaint on the grounds that the complaint had not sufficiently alleged that the disputed claims were false. Id. at 487.

Citing to the Supreme Court's holding that the "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act," the Third Circuit affirmed the district court's dismissal of the complaint, holding that the complaint did not adequately allege materiality. Id. at 489 (quoting Escobar, 136 S.Ct. at 1996). The panel held that the relator had not adequately alleged materiality where the complaint contained "no factual allegations showing that CMS would not have reimbursed these claims had these [alleged reporting] deficiencies been cured." Id. at 490. The court continued:

> Simply put, a misrepresentation is not material to the Government's payment decision, when the relator concedes that the Government would have paid the claims with full knowledge of the alleged noncompliance. Similarly, we think that where a relator does not plead that knowledge of the violation could influence the Government's decision to pay, the misrepresentation likely does not "have[ ] a

natural tendency to influence ... payment," as required by the statute. See 31 U.S.C. § 3729(b)(4). At a minimum, this would be very strong evidence that the misrepresentation was not material.

Id. (alteration original) (quotations and citations omitted).

EHR relies heavily on Escobar and Petratos.

### 3. Application

Judge O'Neill largely anticipated the Escobar materiality standard when he ruled, in the context of his discussion of legal falsity that "[u]nder the facts relator has alleged, it is plausible that 'if the government knew' that certain factors discussed in CMS guidance for determining inpatient status are rarely or never considered when examining EHR's certifications in the aggregate, it 'might cause [the government] to actually refuse payment.'" (Mem. re Mot. to Dismiss 2d Am. Compl. at 36-37, ECF 93.)

Defendant offers no case law, and certainly no precedential Third Circuit case law, unambiguously holding that a court, in considering a motion to dismiss a complaint (or a supplemental complaint) in a False Claims Act case such as this one must go outside the Supplemental Complaint and accept Defendant's contention that serving a qui tam complaint on the United States is sufficient to impute "actual knowledge," in Escobar's terms, to the government of lack of compliance with Medicare requirements. This is especially so given that client hospitals typically do not include the inpatient certifications from Defendant when submitting claims for reimbursement and instead operate on an "honor system," as Relator alleges in the Second Amended Complaint. (See ECF 101 ¶ 114, 120.) On the facts Relator has alleged, Medicare would have no way of knowing whether Defendant had been involved in the submission of particular claim.

13

The Court therefore finds that the detailed allegations of the Supplemental Complaint regarding Relator's experience at client hospitals plausibly allege that Defendant's false inpatient certifications were material to the government's decision to pay Medicare claims in the period 2012-15.

For purposes of a Rule 12 motion, Plaintiff has adequately alleged materiality under Escobar and Petratos.

**B. Particularity**

False Claims Act cases must be pled with particularity under Rule 9(b). Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155 (3d Cir. 2014). The parties dispute whether the Supplemental Complaint meets the Rule 9(b) standard for particularity applicable in this Circuit.

In the Third Circuit, "it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" Id. at 156 (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009.)) At the pleading stage, a claimant is not required to "identify a specific claim for payment…to state a claim for relief." Foglia, 754 F.3d at 156. "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 307 (3d Cir. 2016) (quoting In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)).

Although Relator necessarily lacked knowledge of the secret, proprietary information used to generate inpatient certifications after he left employment at Defendant—which Defendant strongly implies should doom his Supplement Complaint—Relator has provided

14

ample information from his jobs at EHR client hospitals to allege plausibly that Defendant was engaged in an ongoing scheme to cause hospitals to submit large numbers of false inpatient Medicare claims, including large numbers of cases at the hospitals where Relator worked between 2012 and 2015 that initially failed inpatient criteria. This satisfies the standard articulated in Foglia for pleading FCA claims with particularity under Rule 9(b). See 754 F.3d at 156.

## VI. Conclusion

For the reasons stated above, Defendant's motion to dismiss the Supplemental Complaint (ECF 191) is **DENIED**.[1] An appropriate order follows.

O:\CIVIL 12\12-4239 Polansky v Exec Health Resources\12cv4239 Supplemental MTD Memo.docx

---

[1] This case is proceeding towards a "Whistleblower" trial of limited claims to assist the Court in evaluating the totality of claims and defenses, to assist the parties in possible settlement, and probably to achieve jury verdicts which may have res judicata and/or collateral estoppel impact on additional, or possibly, all other claims. Pretrial motions are pending on the process for selection of limited claims for discovery, followed by a trial of limited claims, hopefully, by the end of this calendar year.